# Richmond.

## FONTICELLO MINERAL SPRINGS COMPANY, INC. v. CITY OF RICHMOND.

March 17, 1927.

1. EMINENT DOMAIN—*General and Special Statutes—Special Statute Supersedes General Statute so far as there is Conflict.*—The general eminent domain statute, Code of 1919, section 4363, is superseded, as to the city of Richmond, by the charter of Richmond, Acts of 1914, page 33, authorizing the city to acquire property by condemnation, to the extent that the charter conflicts with the general law.

2. EMINENT DOMAIN—*Attempt to Obtain an Agreement with Landowner—Case at Bar.*—In the instant case, eminent domain proceedings by the city of Richmond, it was contended that the court erred in confirming the commissioners' report as to just compensation because it did not appear that the city of Richmond could not agree on terms of purchase with the landowner. It appeared from correspondence between the city and the landowner, and other evidence in the case, that negotiations were conducted between the parties in an effort to agree upon a price for the property. It was clear that the city made a *bona fide* effort to purchase the property and that the parties could not agree on the price.

   *Held:* That it followed that the city had a right to institute condemnation proceedings and the court had jurisdiction to hear and determine the case.

3. EMINENT DOMAIN—*Just Compensation—"Fair and Full Equivalent"—"Full and Perfect Equivalent."*—In eminent domain proceedings the court instructed the commissioners that the phrase "just compensation" meant a "fair and full equivalent" for the loss sustained by the taking for public use. It was objected to this instruction that it should have told the commissioners that just compensation meant a "full and perfect equivalent" instead of "fair and full equivalent."

   *Held:* That there was no merit in this objection as there was no substantial distinction between the meaning of the phrases.

4. EMINENT DOMAIN—*Just Compensation—Availability of Property for Use in the Future.*—In eminent domain proceedings the court instructed the commissioners that in estimating the value of the property all the capabilities of the property and all uses to which it may be applied, or for which it is adapted, are to be considered. This in-

struction is not subject to objection that it prevented the commissioners from ascertaining what the property was worth from its availability for uses both now and in the future.

5. EMINENT DOMAIN—*Just Compensation—Conflict in Instructions—Case at Bar.*—In eminent domain proceedings the court instructed the commissioners that in estimating the value of the property all the capabilities of the property and all uses to which it may be applied, or for which it is adapted, are to be considered. The instruction concluded in the following language: "The commission is not to value the tract upon the theory of what it might bring platted and divided up into building lots; that they are to inquire what a present purchaser would be willing to pay for it in its present condition and not what a speculator might be able to realize out of a resale in the future."

    *Held:* That the latter clause of the instruction did not contradict the former.

6. EMINENT DOMAIN—*Just Compensation—Value of the Land—Speculative or Possible Value.*—In determining the value of land taken by eminent domain proceedings, it is the present actual value of the land, with all its adaptations to general and special uses, and not its prospective or speculative or possible value based on future expenditures and improvements that is to be considered.

7. EMINENT DOMAIN—*Award for Land and its Appurtenances Include Spring on the Premises.*—Report of commissioners in eminent domain proceedings read that their award, $30,000, was "for the land, all appurtenances thereto belonging and all buildings thereon taken in this proceeding."

    *Held:* That this clearly included the value of a spring on the land, where it appeared from testimony that the commissioners considered all evidence as to the value of the spring.

8. EMINENT DOMAIN—*Appeal—Conflicting Evidence—Weight of the Finding of the Commissioners—Setting Aside Finding of Commissioners.*—Where eminent domain proceedings are conducted according to law, and the evidence as to what would be just compensation for the property to be taken is in conflict, the Supreme Court of Appeals cannot set aside the finding of the commissioners, unless they proceeded upon erroneous principles, or unless the amount allowed is so grossly inadequate as to show prejudice or corruption on the part of the commissioners. They may base their finding largely upon facts obtained by a view of the property, which do not appear in the record.

9. EMINENT DOMAIN—*Due Process of Law—Exercise of the Power of Eminent Domain.*—The proper exercise of the power of eminent domain, in the interest of the public, is due process of law.

10. EMINENT DOMAIN—*Valuation of Property—Profits from Business Conducted on the Property.*—The authorities agree that loss of profits in a business destroyed or damaged, where property is taken in the

exercise of eminent domain, is not an element for consideration in determining the market value, because a matter of speculation and conjecture. While it is proper to show how the property is used, it is incompetent to go into the profits of the business carried on upon the property.

11. EMINENT DOMAIN—*Parties to the Proceedings—Trustee in Deed of Trust on Property Condemned—"Owner" and "Tenant of the Freehold."*— Code of 1919, section 4365, requires in eminent domain proceedings that notice be served upon the "tenant of the freehold," his guardian or committee. The holder of a deed of trust is not, therefore, entitled to notice, nor is he an "owner" of the property within the meaning of the statute. "Tenant of the freehold" means the tenant in possession appearing as the visible owner.

12. EMINENT DOMAIN—*Landlord and Tenant—Commissioners Finding Value of Property as a Whole—Court to Apportion between Landlord and Tenant.*—Under section 4374 of the Code of 1919, there was no merit in the contention that the commissioners should have reported what compensation should be awarded the tenant of the property. That is a duty which the statute imposes upon the court. The commissioners correctly ascertained the value of the property to be taken as a whole.

13. EMINENT DOMAIN—*Different Interest in the Property—Value of Property as a Whole—Apportionment.*—When there are different interests or estates in the property, the proper course is to ascertain the entire compensation as though the property belonged to one person, and then apportion this sum among the different parties according to their respective rights. The value of property cannot be enhanced by any distribution of the title or estate among different persons or by any contract arrangements among the owners of different interests.

14. EMINENT DOMAIN—*Judgment of Lower Court Presumed to be Correct— Appeal and Error—Burden of Showing Error.*—In an eminent domain proceeding the judgment of the court below overruling exceptions to the report of the commissioners is presumed to be correct and the burden is upon appellant to show reversible error.

15. EMINENT DOMAIN—*Award—Inadequate Compensation—Appeal.*—While, if members of the commission, some of the members of the appellate court might have voted for a larger compensation, if the compensation allowed by the commission cannot be said to be so grossly inadequate as to show prejudice or bias on their part, the award cannot be disturbed.

Error to a judgment of the Hustings Court, Part II, of the city of Richmond, in a proceeding upon the condemnation of land.    Judgment for plaintiff.    Defendant assigns error.

*Affirmed.*

The opinion states the case.

R. L. *Montague* and *S. S. P. Patteson*, for the plaintiff in error.

*James E. Cannon, L. F. Cary* and *R. T. Lacy*, for the defendant in error.

WEST, J., delivered the opinion of the court.

The city of Richmond instituted this proceeding against Fonticello Mineral Springs Company, Incorporated, to secure, by condemnation, the title to twelve acres of land, located in that portion of the city called South Richmond, formerly known as the Taylor Springs property, now known as the Fonticello Springs, for park and playground purposes.

The land is bounded by Bainbridge and Perry streets on the north and south, and by 27th and 29th streets on the east and west, respectively, on each of which streets buildings have been erected near the property.

The parties will be referred to as plaintiff and defendant with respect to their positions in the lower court.

On November 11, 1924, the court appointed commissioners to ascertain what would be a just compensation for the land proposed to be taken. The commissioners viewed the premises, heard the testimony of witnesses, and on December 8, 1924, reported $30,000 as just compensation. Exceptions were filed to the report, and the city, as directed, deposited that sum in bank to the order of the court. On May 12, 1925, the Fonticello Corporation, lessee of the defendant, filed its petition in the cause, asking for compensation.

Upon the final hearing the court entered a judgment, overruling the exceptions to and confirming the report in all respects, and ordering that the case be referred to a special commissioner to ascertain what persons are entitled, and in what proportions, to compensation allowed. To this judgment and order this writ of error was allowed.

It is contended that the court erred in confirming the commissioners' report, because it does not appear that the city of Richmond could not agree on terms of purchase with the Fonticello Mineral Springs Company, Incorporated, for the land sought to be condemned.

The petition filed by the city alleges that the city of Richmond made an effort to agree with the owners of the property, but was "unable to agree upon the price and terms, because of inability to agree upon the compensation to be paid." The defendant filed no plea to the petition, and did not put this question in issue until it filed exceptions to the report of the commissioners.

The charter of the city of Richmond, as amended in 1914 (Acts 1914, page 33), authorizes the city to acquire property by condemnation, "whenever the city of Richmond cannot agree on terms of purchase or settlement with those entitled to such subject, because of the incapacity of such owner, or because of the inability to agree upon the compensation to be paid, or other terms of settlement or purchase, or because the owner, or some one of the owners of the subject proposed to be acquired, is a non-resident of this State, or cannot, with reasonable diligence, be found in this State, or is unknown." Section 22.

[1] The language quoted from the city charter is slightly in conflict with the language of the Code,

section 4363, and to the extent of such conflict supersedes the provisions of the general statute as to the city of Richmond.

In *Chambers* v. *City of Roanoke*, 114 Va. 768, 78 S. E. 407, 408, the court says: "The prior statute is general in its terms and applies to all cities and towns of the Commonwealth, while the latter is limited in its operation alone to the city of Roanoke. In such case the latter statute must be construed to be a qualified amendment of the general law, and controlling in the locality to which it applies."

It appears from the correspondence between the city and the defendant, and the other evidence in the case, that negotiations were conducted between the parties in an effort to agree upon a price for the property at which the defendant would sell and the city could afford to buy. On August 14, 1924, defendant offered to let the city take the property at $100,000, but the offer was not accepted. After having exchanged several letters on the subject, W. S. Forbes, president of the defendant, wrote the assistant city attorney, on September 27, 1924, that he would sell the property to the city for $90,000. On September 19, 1924, the committee on finance rejected this offer and instructed the city attorney to proceed to acquire the property by condemnation.

[2] It is clear that the city made a *bona fide* effort to purchase the property, and could not agree on the terms of purchase because of the "inability to agree upon the compensation to be paid." It follows that the city had the right to institute this proceeding, and that the court had jurisdiction to hear and determine the case.

[3] On motion of the city the court gave the commissioners five instructions, numbered 1 to 5, inclusive. The next assignment of error is to the action of the

court in giving instructions 3 and 4, which read as follows:

3. "The phrase just compensation means a fair and full equivalent for the loss sustained by the taking for public use. It would be unjust to the public if it were required to pay more than a fair value for the loss sustained by the property owner in the taking of his property for the general good, and it would be unjust to the owner if he should receive less than a fair value for such loss. To arrive at this fair value the interests of the public and of the owner and all of the circumstances of the particular appropriation should be taken into consideration."

4. "The value of the property taken is the market value, and the market value of property is the price it will bring when offered for sale by one who desires, but is not obliged, to sell, and is bought by one who is under no necessity of having it. In estimating its value all the capabilities of the property and all the uses to which it may be applied or for which it is adapted are to be considered.

"It is not a question of the value of the property to the city or to the owner, nor can the value be enhanced by an unwillingness to sell it or because the city needs the particular property. If, because of its surroundings, or natural advantages, or its intrinsic character, the property is peculiarly adapted to some particular use, all the circumstances which make up this particular adaptability may be shown and the fact of such adaptation be considered in estimating the compensation. But the value for this especial and possible purpose, or for this highest and best use, is not the test, the commission should award only the fair market value of the land as it stands today, in view of all the purposes to which it is reasonably and naturally adapted, and not on a basis

of future indications and investments, that is the commission is not to value the tract upon the theory of what it might bring platted and divided up into building lots; that they are to inquire what a present purchaser would be willing to pay for it in its present condition and not what a speculator might be able to realize out of a resale in the future."

The objection to instruction No. 3 is that it improperly told the jury that "just compensation means a fair and full equivalent," when it should have told them that it means a "full and perfect equivalent."

The objection to instruction No. 4 is that it prevented the commissioners from ascertaining what the property was worth in the market from its availability for uses both now and in the future, and is contradictory.

Instruction No. 3 was taken from an instruction approved by the court in *City of Richmond* v. *Williams,* 114 Va. 688, 77 S. E. 492, which says: "Just compensation" means a "fair and full equivalent" for the loss sustained by the taking for public use. The instruction is found in the record in that case.

Judge Campbell, speaking for the court, in *Charles, etc.* v. *Big Sandy, &c., R. Co.,* 142 Va. 512, 129 S. E. 384, decided since this proceeding was instituted, said the compensation allowed must be "a full and perfect equivalent," or a "full and exact equivalent." Judge Campbell says, at page 526 (129 S. E. 388): "The language 'full and exact equivalent,' as applied to the case at bar, means taking into consideration the adaptability of the land for railroad purposes as an element in estimating the market value thereof."

Instruction No. 4, in the instant case, which must be read with instruction No. 3, tells commissioners that in estimating the value of the property they should consider all the capabilities of the property

and all uses to which it may be applied, or for which it is adapted. When construed in the light of all the instructions given in the two cases, we are unable to draw any substantial distinction between the meaning of the phrases, "fair and full equivalent" and "full and perfect equivalent." If the amount allowed fairly and fully compensates for the loss sustained, it is a full and perfect equivalent for the property taken. For the purposes for which they were used, the three phrases mean the same thing.

[4, 5] The contention of the defendant that instruction No. 4 prevents the commissioners from ascertaining what the property was worth from its availability for uses both now and in the future, is answered by the very language of the instruction, when it says: "In estimating its value *all the capabilities* of the property and *all uses to which it may be applied*, or for which it is *adapted*, are to be considered   *   *   the commission should award only the fair market value of the land as it stands today, *in view of all the purposes to which it is reasonably and naturally adapted   *   **" (Italics ours.) Besides, instruction No. 4, down to the last clause, reading "that is, the commission is not to value the tract upon the theory of what it might bring platted and divided up into building lots; that they are to inquire what a present purchaser would be willing to pay for it in its present condition and not what a speculator *might* be *able to realize* out of a *resale in the future*," was taken from an instruction approved by the court in *Richmond* v. *Williams, supra.* And the clause just quoted was approved by this court in an instruction given in *Richmond & P. Electric R. Co.* v. *Seaboard Air Line R. Co.*, 103 Va. 399, 49 S. E. 512. The clause taken from the *Seaboard Case* does not contradict that part of the instruction, above

quoted, which told the commissioners to consider all the uses to which it might be applied or for which it is adapted in arriving at its value; but simply tells them not *to value* the tract upon the theory of *what* it *might* bring platted and divided up into building lots; nor at what a speculator *might* be able to *realize* out of a *resale*; but to inquire what a present purchaser would be willing to pay for it in its present condition, considering, of course, as stated in the first paragraph of the instruction, all the uses to which "it may be applied."

[6] This court, in *Appalachian Power Co.* v. *Johnson*, 137 Va. 12, 119 S. E. 253, quoted with approval from the *Seaboard Case, supra,* as follows: "It is the present actual value of the land, with all its adaptations to general and special uses, and not its prospective or speculative or possible value based on future expenditures and improvements that is to be considered."

The instructions correctly state the law and with sufficient clarity not to confuse or mislead the commissioners.

This brings us to the consideration of other exceptions to the commissioners' report.

We have disposed of exceptions 1, 2, 3 and 4, relating to the instructions given the commissioners, and the contention that the city made no effort to agree with the defendant on terms of purchase before instituting condemnation proceedings.

Exceptions 6, 7, 8 and 9 rest upon the contention that the commissioners should have assessed the spring and spring buildings separately from the land, but did not make any assessment of them, thus depriving it of this part of its property without just compensation and due process of law.

It appears from the evidence that the Fonticello

spring water is not a mineral water, but simply a pure spring water, similar to that to be found in fifty other springs in Chesterfield county, with three times the flow, which can be purchased for $100 to $200 apiece; that the entire property, land, spring and buildings, is leased for $300 per month, but the lessee has not had a successful year, is seeking a fifty per cent reduction in his rent, and is contemplating moving elsewhere; that the owners of the Broad Rock spring, a nearby spring with the same kind of water, failed to make any money for fifteen years, and it was sold under a mortgage.   A. L. Adamson, with forty years experience in South Richmond real estate, testified that he did not attach any value to the Fonticello spring.   He valued the land at $22,000 and improvements at $6,000.   Warner Moore, with years of experience with a similar spring, testified that the spring added very little if anything to the value of the property.   James M. Whitfield, an experienced analytical chemist, says the Richmond city water is just as much a mineral water as the Fonticello spring water.   A. N. Pettigrew, with twenty-nine years experience with South Richmond real estate, places the value of the land and improvements at $30,000 to $32,000, and does not think the spring, if the water is not a mineral water, adds anything to the market value of the land.   J. E. Norvell, with fifteen years experience as dealer in South Richmond real estate, values the buildings on the property at $2,500, the land at $22,000, and is of opinion that the spring adds nothing to the value of the property.   J. J. Pollard testified that the property was worth $20.00 per front foot, or $27,160.   It is further shown in evidence that the value of the spring is speculative, depending largely upon the amount of money that is expended in advertising the water.

James M. Whitfield testified that on account of the cracks in the granite formation through which veins of water run, if the land should be platted and occupied with building lots, there would be constant danger that the spring might be polluted and its value as a spring destroyed.

There was evidence produced on behalf of the defendant that the property cost the defendant $110,000 and was mortgaged for $25,000; that it was once offered $80,000 for it, later $60,000, and that James E. Crass is ready now to take the property at $50,000. But Crass did not make this offer until after this proceeding was instituted to condemn the property. Crass says he wants the property, not for development, but for the location of a Coca-Cola bottling plant.

[7] The commissioners viewed the property and heard all the evidence introduced by both sides as to the value of the land, springs and buildings, and all the uses to which the same could be put. F. B. Dunford, chairman of the commissioners, testified that, after hearing this evidence, without separating the spring from the land, they awarded what they considered the fair market value of the entire property. The report reads, that the award of $30,000 is "for the land, all appurtenances thereto belonging and all buildings thereon taken in this proceeding." This clearly includes the spring. R. L. Patram and S. P. Bass, two other commissioners, testified that they considered all the evidence as to the value of the spring and reached the conclusion that it added nothing to the value of the land. The other commissioners, Campbell and Woodfin, gave no testimony which conflicts with that of Bass, Dunford and Patram.

[8] Where the proceeding is conducted according to law, and the evidence as to what would be just com-

pensation for the property to be taken is in' conflict, this court cannot set aside the finding of the commissioners, unless they proceeded upon erroneous principles, or unless the amount allowed is so grossly inadequate as to show prejudice or corruption on the part of the commissioners.   They may base their finding largely upon facts obtained by a view of the property, which do not appear in the record.

In *Miller* v. *Pulaski*, 114 Va. 89, 75 S. E. 767, 769, the court said:   "Conceding that the evidence taken by the commissioners was before the court when it passed upon the exceptions to their report (though this is denied by the defendant in error), this court could not disturb the findings of the commissioners. That evidence is conflicting, and there is nothing to show that the damages allowed, if inadequate at all, are so inadequate as to show prejudice or corruption, and without this the settled rule of this court and of courts generally is not to disturb the findings of the commissioners."

In *Richmond & P. R. Co.* v. *Seaboard Air Line R. Co., supra*, at page 406 (49 S. E. 514), the court quoting from *Shoemaker* v. *United States*, 147 U. S. 306, 13 S. Ct. 361, 37 L. Ed. 170, and Mills on Eminent Domain, 246, says:   "The commissioners hear the evidence and frequently make their principal evidence out of a view of the premises, and this evidence cannot be carried up so as to correct the report as being against the weight of evidence.   Hence, for an error in the judgment of commissioners in arriving at the amount of damages there can be no correction, especially where the evidence is conflicting.   Commissioners are not bound by the opinion of experts, or by apparent weight of evidence, but may give their own conclusions."

[9] Having exercised the power of eminent domain to secure the defendant's property, it cannot be said that the taking was without due process of law. The proper exercise of such power, in the interest of the public, is due process of law. *Painter* v. *St. Clair*, 98 Va. 88, 34 S. E. 989.

[10] There is no merit in the contention that the award should have allowed something for the profits earned in the business conducted on the property. The duty of the commissioners is to ascertain the fair market value of the property to be taken, and profits on business so conducted are too speculative and too uncertain to be made a part of such value.

In *Hunter* v. *C. & O. Ry. Co.*, 107 Va. 166, 59 S. E. 415, 418, 17 L. R. A. (N. S.) 124, the court said: "The authorities agree that loss of profits in a business destroyed or damaged, where property is taken in the exercise of eminent domain, is not an element for consideration in determining the market value, because a matter of speculation and conjecture."

In Lewis on Eminent Domain, section 487, we find this: "While it is proper to show how the property is used, it is incompetent to go into the profits of the business carried on upon the property. No damages can be allowed for injuries to the business. The reason is that the owner is entitled only to the value of the property taken and the damage to the remainder if any."

It is contended that the report ought not to have been confirmed because the trustee in the deed of trust which covers the property was not made a party to these proceedings nor served with process.

[11] The statute in Virginia (Code 1919, section 4365), only requires that notice be served upon the "tenant of the freehold," his guardian or committee. The holder

of a deed of trust is not, therefore, entitled to notice, nor is he an "owner" of the property within the meaning of the statute.   *Tenant of the freehold* means the tenant in possession appearing as the visible owner.   *Hope* v. *N. S. R. R. Co.*, 79 Va. 288.

[12] Section 4374 of the Code provides that upon the payment of the amount of the compensation allowed into court, the interest or estate of the owner or owners which has been condemned shall terminate, and they shall have the same interest in the compensation allowed which they had in the property taken, and that all liens by deed of trust or otherwise shall be transferred to such money so paid into court, and the court shall make such distribution of the money as to it may seem right; and that the court may direct a commissioner of the court, or a special commissioner, to inquire and ascertain what persons are entitled to the money, and in what proportions.

The court properly referred the case to a special commissioner to make the inquiries authorized by the statute.

There is no merit in the contention that the commissioners should have reported what compensation should be awarded the tenant.   This is a duty which the statute, section 4374, *supra*, imposes upon the court. The commissioners correctly ascertained the value of the property to be taken *as a whole*.

[13] Mr. Lewis, in his work on eminent domain, section 716, says: "When there are different interests or estates in the property, the proper course is to ascertain the entire compensation as though the property belonged to one person, and then apportion this sum among the different parties according to their respective rights.   The value of property cannot be enhanced by any distribution of the title or estate among different

persons or by any contract arrangements among the owners of different interests. Whatever advantage is secured to one interest must be taken from another and the sum of all the parts cannot exceed the whole."

In section 719, the same author makes this statement: "Where the premises are subject to lease, the better course would seem to be, as already pointed out, to ascertain the value of the property or damage thereto, as an entirety, and then the value of the tenant's interest or damage thereto, and award the balance to the landlord."

[14, 15] The exceptions to the report of the commissioners not passed upon in this opinion are without merit, and a discussion of them would prove unprofitable. The judgment of the lower court is presumed to be correct and the burden was upon the defendant (plaintiff in error) to show reversible error. This it has failed to do. The proceeding was conducted according to law. The commissioners were fair and impartial freeholders. They viewed the property and heard all the evidence, and the evidence was ample to support their finding. While, if members of the commission, some of the members of the court might have voted for a larger compensation, the compensation allowed by the commission cannot be said to be so grossly inadequate as to show prejudice or bias on their part, or to authorize the court to disturb their conclusions.

For the foregoing reasons, the judgment and order will be affirmed.

*Affirmed.*