# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

## D. R. KORNEGAY v. CITY OF RICHMOND.

January 13, 1947.

Record No. 3130.

Present, Holt, C. J., and Hudgins, Gregory, Eggleston, Spratley and Buchanan, JJ.

1014

1016

The opinion states the case.

*Gordon B. Ambler*, for the plaintiff in error.

*Horace H. Edwards* and *Olin A. Rogers*, for the defendant in error.

EGGLESTON, J., delivered the opinion of the court.

On March 23, 1944, the city of Richmond instituted condemnation proceedings in the court below to acquire certain land, including the building thereon, owned by D. R.

Kornegay, located at the southeastern intersection of Forest Hill avenue and Westover Hills boulevard, in the city of Richmond, for the purpose of widening the boulevard. The proceeding was instituted under section 22 (b) of the city charter, Acts 1926, ch. 318, as amended by Acts 1942, ch. 252, p. 372. In conformity with the act the city, upon the institution of the proceeding, paid into the registry of the court, to the credit of the cause, its estimate of the total sum necessary to compensate the owner for the property taken or damaged. At the same time an order was entered vesting the absolute fee-simple title to the property in the city.

On June 10, 1944, on motion of the city, five commissioners were appointed with the usual direction to meet on the premises, to view the land sought to be condemned, to hear such evidence as might be offered by the parties in interest, to ascertain and report to the court the just compensation due the owner for the land taken, and the damages, if any, to his adjacent land beyond the benefits that would accrue to the latter by reason of the contemplated street improvement.

After the commissioners had been duly sworn and had received written instructions from the court, they held a number of hearings extending over several weeks, during which they heard the testimony of various witnesses on behalf of both the city and the property owner. On September 15, 1944, they filed their written report in which they fixed the just compensation for the Kornegay land taken, including the building, at $7,000, and found that there was no damage to the residue of his property beyond the benefits accruing to it from the improvement.

The property owner filed exceptions to the report, alleging that the award made by the commissioners was "grossly inadequate, unjust and unreasonable," that it had been arrived at through a misconception and misapplication of the principles of law which should have governed them in their action, and, further, that the commissioners had been erroneously and improperly instructed by the court.

About six months later the exceptions were heard by the

trial court. A number of witnesses, including the five commissioners, were heard *ore tenus*. After a consideration of this oral testimony and the transcript of the evidence adduced before the commissioners, the trial court overruled the exceptions and entered a judgment confirming the commissioners' report. To review that judgment the present writ has been allowed. The order under review shows that the city has paid into the registry of the court the difference between the amount which it had theretofore deposited and the amount fixed by the final judgment.

There is a motion to dismiss the writ of error on the ground that the record of the proceedings in the lower court has not been prepared in the required statutory manner.

First, it is said, the city attorney was not given reasonable notice of the time and place at which the certificate authenticating the incidents of the trial would be presented to the judge of the trial court, as required by Rule 21 of this court. Nor, it is said, were such incidents of the trial made a part of the record by a proper bill or certificate of exception, after reasonable notice, in accordance with either section 6252 or 6253 of the Code.

Within the proper time after the date of the final judgment, counsel for the plaintiff in error gave to the city attorney a proper notice that on January 18, 1946, application would be made to the clerk of the lower court for a transcript of the record. Before the latter date Mr. Ambler, who had taken no part in the trial below and was subsequently employed to prosecute this appeal on behalf of the property owner, prepared, and Mr. Rogers, the assistant city attorney who was in charge of the litigation for the city, endorsed, an order which purported to make a part of the record the stenographic transcript of the testimony taken *ore tenus* before the trial court, that taken before the commissioners, together with the instructions of the court, granted and refused, and the exceptions thereto.

In his affidavit, Mr. Ambler states that he "was definitely of the impression" that Mr. Rogers "understood that the record would be presented for authentication at that time,"

that he (Mr. Ambler) inquired whether the assistant city attorney desired any further written notice, that the latter replied in the negative, saying that he (Mr. Ambler) might "go ahead and present his record."

Mr. Rogers, in his affidavit, states that he understood that the conversation related merely to the entry of the particular order which he had endorsed, and that he received no notice, written or verbal, that the trial judge would be requested to certify or authenticate, in any other manner, the record of the proceedings in the lower court.

At any rate, the order prepared by counsel for the plaintiff in error, and endorsed by the assistant city attorney, was presented to and entered by the trial court on January 18. It is unnecessary to set this order out in full. Suffice it to say that it does not sufficiently identify the specified documents in order to incorporate them in the record, and falls within the category of a skeleton bill of exception so frequently condemned by us. See *Lawrence & Son* v. *Merkel*, 167 Va. 297, 189 S. E. 162, and cases there cited.[*]

On January 18, when the order was entered, the clerk had not completed the transcript of the record and hence it could not be certified or authenticated by the trial judge. Accordingly, at the request of Mr. Ambler, the matter was continued until January 21, when the clerk indicated that the record would be ready.

The affidavits are silent as to whether the city attorney had actual notice of this continuance. In any event, on January 21, and a short while before the time set for the appointment between the trial judge and counsel for the plaintiff in error, Mr. Rogers went to the clerk's office, received from the clerk the complete record which had been prepared for authentication, examined it, as the clerk said, "for a considerable period of time," and voiced no objection thereto. This record contained an authenticating certificate

---

[*]Apparently this order was not intended by counsel for the plaintiff in error as a final authentication of the record. He was advised by the clerk that its entry was necessary before the *ore tenus* testimony could be copied as a part of the record.

to be signed by the trial judge in which there was a recital that the city had had "due notice of the application for the certification thereof in accordance with law."

Within an hour after Mr. Rogers had left the clerk's office, Mr. Ambler, in accordance with his previous engagement, presented the record to the judge of the trial court for authentication. The judge was informed that Mr. Rogers, the assistant city attorney, "had agreed to be present but had canceled his appointment," that Mr. Rogers had just examined the record and had raised no objection thereto. The trial judge then initialed the various exhibits and signed the certificate, which the city attorney admits properly authenticated the record in the manner required by Rule 21 of this court.

This rule provides that "reasonable notice in writing shall be given to the opposite party or his attorney of the time and place at which" a certificate is to be tendered to the judge of the trial court authenticating the incidents of the trial. This requirement is an important step in perfecting an appeal. Its plain purpose is to give opposing counsel an opportunity of examining the purported record and ascertaining whether it contains an accurate detail of what has transpired in the court below. But, important as it is, the requirement may be waived, particularly where its purpose has been otherwise accomplished. Certainly, that was the result here where counsel for the defendant in error had actual notice that the record was being compiled for authentication, and, after its completion and within an hour of its presentation to the judge of the trial court for certification, he actually examined its contents and made no objection thereto. This and nothing more could he have done if he had been given the required notice.

The facts and circumstances are similar to those in *Grimes v. Crouch*, 175 Va. 126, 130, 131, 7 S. E. (2d) 115, 116, 117, in which we held that the statutory requirement for notice of the tender of a bill of exception under Code, section 6252, had been waived.

It is next said that the record is defective in that the

clerk, instead of delivering to counsel for the plaintiff in error a copy or "transcript" of the record, as required by Michie's Code of 1942, secs. 6339, 6340a (Acts 1924, ch. 430, p. 654, as amended), delivered to him the original transcript of the evidence with the original authentication certificates, without retaining in the clerk's office a copy thereof.

 It is true that these statutes do contemplate that the clerk is to retain in his possession a copy of these documents and is to deliver to the applicant a "transcript" or copy thereof. But the failure to comply with the statutory requirements was the mistake of the clerk and not of counsel. See *Nachman* v. *Chatham-Phenix Nat. Bank, etc., Co.*, 161 Va. 576, 582, 583, 171 S. E. 676, in which we held, in a somewhat similar situation, that the plaintiff in error should not be made to suffer for a mistake of the clerk.

For these reasons the motion to dismiss the writ is denied.

On the merits there are a number of assignments of error. First, it is said that the award of the commissioners is "grossly inadequate, unjust and unreasonable," and for that reason should not have been confirmed by the lower court. In short, the contention is that the amount fixed by the commissioners is not supported by the evidence.

At the time of the institution of the condemnation proceedings, Kornegay owned a lot fronting 107 feet on the south side of Forest Hill avenue and extending back 200 feet along the eastern side of Westover Hills boulevard, with a width in the rear of approximately 125 feet. Forest Hill avenue runs east and west, and Westover Hills boulevard runs north and south, through what is commonly called South Richmond. For the purpose of widening Westover Hills boulevard, the city proposed to acquire a strip of this land fronting 32 feet on the south side of Forest Hill avenue, and extending 200 feet along the eastern side of Westover Hills boulevard, with a width of approximately 45 feet at the southern end of the strip.

On this land was located a two-story stucco building, covering a ground space of 28 by 32 feet. The building

had been erected in 1922. The first floor had been used as a grocery store and the second floor as living quarters. At the time of the condemnation the building was vacant. It was equipped with neither plumbing nor heating facilities. Witnesses for the city said it was in poor condition which is corroborated by an inspection of the photographs. Kornegay described its condition as "fair."

After the removal of the building and the widening of the street the remaining Kornegay property was, of course, likewise located at the southeastern intersection of the two streets. The residence had a frontage of 75 feet along the south side of Forest Hill avenue, and a depth of 200 feet along the eastern side of Westover Hills boulevard, with a width in the rear of 80 feet.

At the various hearings before the commissioners four witnesses testified on behalf of the city and four on behalf of the property owner as to the value of the property taken and the damage to the residue. The printed record before us contains the testimony of all of the city's witnesses, but for some unexplained reason that of only one of the property owner's witnesses.

It is true that during the oral examination of the commissioners before the trial court some of the figures given by the various witnesses who had testified before the commissioners on behalf of the property owner are stated. But we are without the details of the testimony of these witnesses and the reasons for their valuations. However, it does appear from so much of the record as is before us that the testimony before the commissioners was highly conflicting. The witnesses on behalf of the city placed the value of the land taken at from $2,500 to $5,000, and the building at approximately $2,000, or a total of from $4,500 to $7,000. The witnesses on behalf of the property owner placed the value of the land taken at from $8,000 to $27,000, and the building at from $6,000 to $8,000, or a total of from $14,000 to $35,000. The commissioners fixed the value of the land taken at $4,500 and that of the building at $2,500, or a total of $7,000.

██ Time and time again, this court has said, in varying language, that the report of the commissioners is entitled to great weight, is *prima facie* correct, and must be confirmed unless "good cause be shown against it." Where there is a conflict of evidence before the commissioners neither the trial court nor this court can set aside the award unless it be shown that the commissioners proceeded upon erroneous principles, or unless the amount allowed is so grossly inadequate or excessive as to show prejudice or corruption on their part. This is so because the commissioners may base their finding largely upon facts obtained by their own view of the property which do not appear in the record. *Barnes* v. *Tidewater Ry. Co.*, 107 Va. 263, 58 S. E. 594; *Fonticello Mineral Springs Co.* v. *Richmond*, 147 Va. 355, 137 S. E. 458; *Hannah* v. *Roanoke*, 148 Va. 554, 139 S. E. 303; *Talbot* v. *Norfolk*, 158 Va. 387, 393, 163 S. E. 100.

██ The qualifications and integrity of the commissioners are unquestioned. There is no claim that they were actuated by prejudice, fraud, or any improper motives. There is nothing in the record to indicate that their unanimous findings are not supported by the evidence before them. Consequently, unless they were improperly instructed or misapplied the court's instructions, their award is binding on us.

This brings us to the main contention of the property owner, that the report should have been rejected under the principles laid down in *Talbot* v. *Norfolk, supra,* because, it is said, the testimony of the commissioners shows that they misconstrued and misapplied the instructions of the court, and applied wrong principles in arriving at the amount of the compensation due the property owner.

The first contention in this connection is that the commissioners arrived at their valuation of the land taken by computing the per foot value on the Forest Hill avenue frontage of 32 feet, instead of computing it on the 200 foot frontage on Westover Hills boulevard. It is argued that having arrived at a per foot frontage value of $125, the commissioners should have applied this to the greater frontage along what the property owner says is the more important street.

The record is not clear just why all of the witnesses, including those introduced by the property owner, save one, referred to the property as fronting on Forest Hill avenue. Probably this was due to the fact, with which the witnesses were familiar, that that street is the principal commercial street in the neighborhood. At any rate, there is nothing in the record to indicate that the commissioners placed the same per front foot valuation on each of the streets. So far as the particular property is concerned, it is reasonable to assume that they did not do so. Considering the property as fronting on Forest Hill avenue, the part taken had a frontage of 32 feet with a depth of 200 feet, while considering it as fronting on Westover Hills boulevard, it had a depth of only from 32 to 45 feet.

Moreover, there is nothing in the record to indicate that the frontage on either street was the determining factor in fixing the valuation. It was merely one of the elements which the commissioners considered. Regardless of which be considered the front of the property, its area is, of course, the same.

It is strenuously argued that the testimony of J. Guthrie Smith indicated that he misapplied and misinterpreted the court's instruction that the commissioners should fix the compensation for the land taken at the "fair market value of the property as it stands today," that is, at the time of the taking. Mr. Smith testified that according to his interpretation of the court's construction, he "could not consider speculative values, or a value on a market that was not normal." He defined a normal market as one which is neither "depressed" nor "inflationary." Due, he said, to the federal activities in the Richmond area, he regarded the market as "inflationary" or "speculative."

The property owner argues that the effect of Mr. Smith's reasoning was to fix the value of the property at some period other than the time of taking. But this is not true. Neither an inflated nor a depressed market is the proper criterion of fair market value. The one is unfair to the condemnor and the other is unfair to the property owner.

The subject has been before the courts in a number of recent cases. In *In re Board of Water Supply*, 277 N. Y. 452, 14 N. E. (2d) 789, 792, after pointing out that under the Constitution of New York a person whose property is taken for public use is entitled to "just compensation" as measured by "the fair market value of the property taken as of the date of taking," plus damages resulting to the residue, the highest court of New York said: " 'Fair market value' means neither panic value, auction value, speculative value, nor a value fixed by depressed or inflated prices. * * * 'Fair market value' of property actually taken as of the date of appropriation resides in an estimate and a determination of what is the fair, economic, just and equitable value under normal conditions." Such a principle, the court said, does not "abrogate or destroy the general rule that value must be fixed as of the time when the property was converted or taken."

In *Public Market Co.* v. *Portland* (Ore.), 170 P. (2d) 586, 597, it is said: " * * * market value means value under ordinary conditions—not conditions either of depression or inflation."

See also, *Suburban Land Co.* v. *Inhabitants of Arlington*, 219 Mass. 539, 107 N. E. 432, 433; *Howell* v. *State Highway Dept.*, 167 S. C. 217, 166 S. E. 129, 131, 133; 29 C. J. S., Eminent Domain, sec. 137, p. 976.

But aside from this, it is significant that in applying his reasoning, Mr. Smith reached the same conclusion as his four colleagues as to the fair market value of the property at the time of the taking. None of the other commissioners referred to the market as being "inflationary" or "speculative." Indeed, Mr. Smith insisted that the amount awarded was, in his opinion, the "present market value" of the property.

Complaint is next made that the testimony of Commissioners Sheppard and Shields shows that they gave little weight; if any, to the evidence of the experts, but based their award largely upon their own respective opinions.

 It is well settled that "commissioners are not bound by the opinions of experts or by the apparent weight of evi-

dence, but may give their own conclusions" of the value of the property. *Barnes* v. *Tidewater Ry. Co., supra* (107 Va., at page 267). See also, *Hannah* v. *Roanoke, supra* (148 Va., at page 568); *Shoemaker* v. *United States,* 147 U. S. 282, 306, 13 S. Ct. 361, 393, 37 L. Ed. 170.

Next it is said that the city "hurriedly and without explanation" removed the building before the commissioners had an opportunity of viewing it, and that this destruction of an important part of the evidence deprived the owner of his property without due process of law.

The record discloses no ulterior purpose or motive on the part of the city in removing the structure. The statutory procedure was strictly complied with. Upon the institution of the proceeding the city paid into the registry of the court what it estimated to be the amount of compensation due the property owner, and an order was entered vesting the title to the property in the city. The record is silent as to when the building was removed, other than that it was some time between the date of the institution of the suit, in March, 1944, and the date of the commencement of the hearings before the commissioners the following July. It appears from a stipulation of counsel that the purpose of the removal was to enable the city, as a part of the contemplated street improvement, to construct an open drain through the land.

Statutes of this character, enabling the condemnor to take possession of the land sought to be condemned and proceed with the contemplated improvement before the final judgment in the condemnation proceedings, are not uncommon. For example, under the Acts of 1940, ch. 380, p. 666 (Michie's Code of 1942, section 1969j(4)), the State Highway Department may postpone condemnation proceedings until after the completion of the improvement without violating the due process or other constitutional rights of the property owner, as was held in *Bailey* v. *Anderson,* 326 U. S. 203, 66 S. Ct. 66, 90 L. Ed. 7.

Then, too, under the statute under which the city proceeded, the property owner, as well as the city, had the

right to apply to the court for the appointment of commissioners to view the property and fix its value. Had he done so promptly, he would not have been deprived of the benefit of this evidence of which he now complains.

 Moreover, there is nothing unusual or uncommon in the judicial process of fixing the value of a building, or other property, after its destruction, upon evidence other than that obtained by the tribunal through a view of the property. It is done every day. In the case before us at least one of the commissioners, as well as several witnesses for the respective parties, had seen the building and were familiar with it. There is no dispute as to its age, size, type of construction and condition. We need not repeat these. Even the owner characterized its condition as "fair" only. The witnesses placed its value at from $2,000 to $8,000. The commissioners testified that they fixed the value at $2,500. Again, we must say such finding is binding on us.

 The report of the commissioners is criticized because it allowed the property owner no amount of damages to the residue of his property by reason of the taking of the 32 feet. But there is nothing in the testimony of the commissioners to warrant the conclusion that in reaching this result they failed to follow or apply correctly the court's instructions on this phase of the case. The commissioners justified their finding by saying, in effect, that they were of opinion that the widening of the street was a benefit rather than a detriment to the residue. As they pointed out, the remaining Kornegay property is a corner lot, fronting 75 feet on Forest Hill avenue and 200 feet on Westover Hills boulevard. It is well adapted to the commercial ventures to which its use is restricted by the zoning laws of the city.

Again, it is said that the trial court should have rejected the commissioners' report because it failed to comply with the provision in Code, section 4367, which requires that the oath subscribed to by the commissioners "be attached to and returned with" their report. It is argued that this provision of the statute is mandatory.

 There is no merit in this contention. Lodged among

the papers in the cause is a certificate showing that each of the commissioners, on June 15, 1944, appeared before a notary public and took the required oath. Furthermore, one of the commissioners testified on direct examination, and the report states, that the oath was actually administered to all of the commissioners jointly before they commenced their duties.

The essential purpose of the statute, of course, is to insure that the oath be given to the commissioners before they enter upon their duties. Here that purpose has been accomplished. While the certificate of the oath should have been attached to the report, as required by the statute, this was, in our opinion, merely a directory and not a mandatory requirement.

Error is assigned to the action of the lower court in accepting in evidence and reading the transcript of the testimony taken before the commissioners. It is argued that this was hearsay testimony and that the witnesses should have been produced and required to testify before the court.

As has been said, one of the exceptions to the report of the commissioners was that the award was grossly inadequate and not in accordance with the evidence before them. We fail to see how the trial court could have passed on this exception without reviewing the evidence upon which the commissioners' report was based.

About ten months prior to the institution of the present condemnation proceeding the city enacted a zoning ordinance, the effect of which was to restrict the use of the Kornegay property to commercial purposes. It also required all buildings in this area to be set back 25 feet from the street line.

The property owner contended before the commissioners that in ascertaining his damages as a result of the condemnation proceedings, they should take into account the restrictions imposed on his property by the zoning ordinance. To meet this contention, and at the request of the city, the court instructed the commissioners that if the Kornegay property "has been, in any way, damaged or if its value has

been, in any way, decreased because of the regulations and requirements of the said zoning ordinance, then the court tells you that such damage or decreased value cannot be awarded by the commissioners as an element of damages in arriving at your award in this proceeding. It is not the duty or the right of the commissioners to attempt to reimburse the defendant for any loss he may have sustained or will sustain because of the enactment of the said zoning ordinance."

██ The granting of this instruction is assigned as error. In our opinion the instruction was plainly right. The enactment of the zoning ordinance was in no wise connected with the condemnation proceeding. The former restricted the use of the property had the latter never been instituted.

██ Moreover, in *West Bros. Brick Co.* v. *Alexandria,* 169 Va. 271, 287, 192 S. E. 881, 888,* we pointed out that damage to property as the result of restrictions imposed by zoning laws is "incidental to a lawful exercise of police power," and is not "the damage contemplated by" the constitutional provisions requiring compensation for property taken or damaged in eminent domain proceedings.

There was an objection to Instruction No. 4 which is carried into an assignment of error. This instruction needs no discussion. It is substantially a combination of several instructions which were approved by us in *Fonticello Mineral Springs Co.* v. *Richmond, supra.*

We find no error in the record, and the judgment complained of is

*Affirmed.*

Hudgins, J., dissenting.

The landowner was entitled to have the Commissioners ascertain the just compensation for the land taken and award damages, if any, resulting to adjacent property and

*Appeal "dismissed for want of a substantial federal question," 302 U. S. 658, 58 S. Ct. 369, 82 L. Ed. 508. Rehearing denied, 302 U. S. 781, 58 S. Ct. 480, 82 L. Ed. 603.

certify the same to the court. That is, the landowner is entitled to the fair market value of the land at the time of the taking. One of the Commissioners stated:

"I considered all the elements that I considered I had a right to consider under the instructions from the court. In other words, I could not consider speculative values, or *a value on a market that was not normal*. Some people might consider those things, but I did not feel that was in my province to consider, under the instructions of the court."

It thus appears that at least one of the Commissioners in determining the sum to be awarded considered what would have been the value of the land under normal conditions. The city did not defer its seizure of the property until normal conditions returned. The city should pay the just compensation determined as of the time the seizure is made and not the just compensation that one or more of the Commissioners thinks it would be under some other conditions.

The judgment should be reversed and new Commissioners appointed.