# Staunton

## Appalachian Electric Power Company, a Corporation v. James Raymond Gorman and Others.

September 6, 1950.

Record No. 3675.

Present, Hudgins, C. J., and Gregory, Eggleston, Spratley, Buchanan and Miller, JJ.

The opinion states the case.

*John L. Abbot and Arthur B. Davies, III,* for the plaintiff in error.

*Perrow & Rosenberger, William Lyne Wilson* and *Joseph V. Gorman,* for the defendants in error.

SPRATLEY, J., delivered the opinion of the court.

This is a condemnation proceeding instituted by the Appalachian Electric Power Company, a public service corporation, hereinafter referred to as the petitioner, for the purpose of obtaining a perpetual easement and right of way

for the construction and operation of an electric power transmission line over a tract of land owned by James Raymond Gorman and others, in Bedford county, Virginia. Virginia Code, 1942 (Michie), section 4364 *et seq.*; Virginia Code, 1950, section 25-8 *et seq.*

The easement, 50 feet wide, extends a distance of 561 feet, more or less, through the tract involved. On it is to be located a steel tower 100.5 feet in height from the ground, "consisting of four steel or metal legs, planted in the corners of a square with sides not exceeding 25 feet at the ground line, interbraced at intervals along their heights." On the tower will be cross arms on which will be strung not more than 8 wires, cables and conductors for carrying electric energy, at no point less than 25 feet above the ground.

Commissioners were duly appointed by the trial court. The order of their appointment contained the simple instruction that their duties were to ascertain "a just compensation for the interest or estate sought to be condemned * * *, and also to award damages, if any, resulting to the adjacent or other property of the owners or to the property of any other person, * * *."

The commissioners were duly sworn and directed to meet upon the premises described. Neither the petitioner nor the landowners asked the court to instruct the commissioners other than as set out in the order of their appointment.

In opening statements before the commission, counsel for both parties told the commissioners that it was their duty to find the difference between the fair market value of the entire property immediately before and immediately after the easement was taken, considering the property as a whole. Counsel for landowners, in addition, stated he expected the evidence would show that the taking of the easement would cause a revision of a map, theretofore made, of a subdivision of the property into lots of lesser value, and thereby depreciate the value of the whole tract.

The commissioners viewed the property, heard the evidence of witnesses presented by the landowners as to the

value of the land taken and the damage to the residue. During the examination of witnesses, counsel for landowners, over the protest of the petitioner, elicited answers to questions relating to the value of and damages to the lots in a subdivision of the land with the easement imposed thereon. The petitioner offered no evidence. It conceded that the chief value of the property was based on its adaptability for subdivision purposes, and admitted, in its closing argument before the commission, that the property, as a whole, was worth $60,000 to $65,000.

The five commissioners, after hearing the evidence and arguments of counsel, unanimously reported to the court that $1,500 was a just compensation for the interest or estate in the parcel of land taken and that the damages to the adjacent or other property of the landowners amounted to $8,500. Petitioner paid the sum of $10,000 into court, and thereafter filed exceptions to the commissioners' report, alleging that the commissioners "misconceived the applicable principles of law, or gave consideration to improper and erroneous elements of value and evidence thereof."

The exceptions to the commissioners' report were heard by the court on the transcript of the evidence and the opening statements of counsel before the commission; on the evidence of the commissioners, introduced by the power company, to explain their method of fixing the award; and on the evidence of three witnesses, former tax assessors for Bedford county.

The petitioner expressly admitted that there was not "any evidence whatsoever of prejudice or corruption on the part of the commissioners or that the award is so excessive as to show that." It contended the landowners had improperly introduced in evidence an unrecorded map showing a subdivision of the 43½-acre tract, although there had never been any lots sold therefrom, or any improvements, as shown on the map, made thereon; and that the commissioners were misled by the testimony of witnesses who based their estimate of value and damages on lots and subdivisions.

The court overruled the exceptions to the report and entered an order ratifying and confirming it in all respects. Petitioner thereupon applied for and obtained this writ of error.

The principal question before us is whether the commissioners in arriving at their award, followed erroneous principles of law in considering the map mentioned and testimony relating to the value of and damage to individual lots, into which the land might be subdivided for the most advantageous development.

Petitioner further complains that, in the hearing on the exceptions, the trial court failed to give fair and impartial consideration to the testimony, subjected one of its witnesses to an unjustifiable cross-examination with respect to an entirely different matter, and improperly cross-examined the commissioners to lead them into answers supporting their report.

It is also contended that the award was grossly excessive.

The land over which the easement is taken is an irregularly shaped tract of 43½ acres on the west side of the Trents Ferry Road about ¼ of a mile from the city of Lynchburg, Virginia. It is described as the finest piece of property close to Lynchburg for a high-class subdivision for persons desiring to build expensive residences. It is located on hilly terrain and readily adapted to the highest type of subdivision for homes and residences. Immediately adjacent to it are a number of homes and estates, valued at $25,000 to $100,000 each. It is pictured as a natural continuation of one of the finest residential sections close to Lynchburg, suitable for a high-class subdivision for persons desiring to build expensive residences. One of the witnesses said it is "as fine a piece of property for subdivision as I have seen anywhere in the United States; and I have subdivided from north and south, east and west." It is bounded by beautiful estates to the east, and a high-class subdivision borders it on the south, with many expensive

homes. It is in demand for residential subdivision and purchasers have already offered to purchase portions of it.

The entire 43½ acres have been held intact without buildings. In 1940 the owners employed Charles F. Gillette, an experienced landscape architect, to plat the tract into one hundred lots and streets, having the streets follow the natural contours of the property without following the usual gridiron type, in order to avoid cuts and fills. Trees were planted according to the plan, and water and sewer lines were mapped, bids being obtained therefor; but these plans were halted with the beginning of World War II. City water is available within 200 feet. Natural gas lines run along the edge of the property. The land has been cleared so that prospective purchasers can obtain a good view of the entire subdivision. It has a right of way to United States Route 501, and residents can reach the business center of Lynchburg within fifteen minutes. It has the advantage of county taxes. A city bus service runs within 200 yards of the property, and there is a business center a short distance therefrom. The property is rural, though suburban to the city of Lynchburg, with a perfect mountain view and is free from the usual lights, noise, and dirt of a busy city. It is undisputed that it has more advantages than are common to the usual subdivision.

The present market value of the property, as a whole, for subdivision purposes was valued from $55,000 to $65,250, or at $1,250 to $1,500 per acre. The easement sought to be taken cuts diagonally across the northernmost tip or corner of the property, runs over five lots and embraces one and three-quarters acres. The power line and tower proposed to be built stand 23 or 24 feet above the highest point on the entire tract. The construction will interfere with a direct view of the mountains from some portions of the property, and will add some hazards to the land.

Witnesses stated that because of the location of the tower and line, it would be necessary to re-study the property for subdivision; change the location of the lots; change

the lots which originally were laid out on the plat to follow the natural contour of the land, and re-plan the subdivision from the standpoint of allowing cheaper houses.

Two real estate men, experienced in handling subdivisions and familiar with this property, testified that the property as a whole, would depreciate in value fifty per cent because of the easement. To justify their estimate, they said that five lots, shown on the plat, would be unavailable because of the power line; that thirteen lots would be damaged because of the necessity of changing a road as platted, in order to get a reasonable distance away from the high transmission line; and that the remaining lots would suffer sales resistance because of the presence of the line and tower. They estimated the damage to 95 lots, for which the subdivision would be adaptable after the taking of the easement, in the sum of $200 to $250 per lot, and the damage to the 5 lots over which the easement ran as $5,000, or a total of $24,000. They also thought that the power line would change the proposed high-class subdivision to one for medium priced property and reasonably reduce the value of all of the land. The landscape architect was of opinion that the power line would depreciate the entire tract fifty per cent, and that it would become a second-rate development.

Another real estate broker thought that the line would eliminate five lots of the value of $1,000 each, and that in changing the road, as platted, thirteen lots would be damaged to the extent of $9,000; and that sales resistance on the remainder of the tract would average about $200 to $250 a lot, because of the change in platting and the presence of the power line. The elements of damage, based on his analysis, totaled $32,200, and formed a basis for his opinion that the damage to the whole of the property would be fifty per cent of its present market value before the taking.

At the hearing on the exceptions to the report of the commissioners, all five of the commissioners were introduced by the petitioner to testify. They stated that the map in question had been produced before them; that they had

heard the evidence of the various witnesses and had viewed the property; that in arriving at their award they gave consideration to the property as adaptable for subdivision, and to the effect that the power line would have upon the lots in a subdivision; and that they knew that the property had not actually been developed. The members of the commission, without exception, said they considered that the damage awarded was the difference in the present market value of the property, as a whole, as it stood immediately before and after the taking of the easement. They stated that they did not consider the damage lot by lot,—that is, add up the damage to the different lots as analyzed by the real estate brokers,—to arrive at the $8,500; but treated the property as a whole.

Two tax assessors of Bedford county, who had no experience in developing subdivisions, had never dealt in real estate, and had no experience in selling lots, thought that the market value of the property, before condemnation, was $60,000, based upon five times its 1940 tax assessment, and the availability for subdivision. One thought that the present value was $1,000 per acre, considered as a whole. Two of them arrived at the fair market value by dividing the tract into three parcels. The assessors thought the damages would not exceed $2,500 or $4,000.

The parties are in substantial agreement as to the legal principles involved. Petitioner, however, insists that the commissioners failed to properly apply those principles, in that they erroneously based their award on a consideration of improper, irrelevant and inadmissible testimony enhancing the damages.

■ It would have been helpful to the commissioners and tended to the proper discharge of their duties if the court, on its own motion, or upon a request from either of the parties, had instructed them as to what character of testimony and argument was admissible before them. *Virginia-Western Power Co.* v. *Kessinger,* 122 Va. 135, 94 S. E. 186.

The petitioner, not having done so, ought not now to be heard to complain of the lack of instruction.

We have repeatedly enunciated the principles governing the taking of property in condemnation cases. The measure of compensation for property taken is the fair market value of the property at the time of the taking, considering its adaptability and suitability for any legitimate purposes, having regard to the existing business of the community or such as may be reasonably expected in the near future. The true test of damages to the residue of the land not taken is the difference in value before and immediately after the taking, and in ascertaining such damages there may be considered every circumstance, present or future, which affects its then value. Remote and speculative profits and advantages are not to be considered in either instance. *Richmond, etc., Elec. R. Co.* v. *Seaboard Air Line Ry.*, 103 Va. 399, 49 S. E. 512; *Chairman of Highway Comm.* v. *Parker*, 147 Va. 25, 136 S. E. 496; *Chairman of Highway Comm.* v. *Fletcher*, 153 Va. 43, 149 S. E. 456; *Long* v. *Shirley*, 177 Va. 401, 14 S. E. (2d) 375; *Anderson* v. *Chesapeake Ferry Co.*, 186 Va. 481, 43 S. E. (2d) 10.

In *Richmond, etc., R. Co.* v. *Chamblin*, 100 Va. 401, 41 S. E. 750, the rule is thus stated: "In determining the value of land appropriated for public purposes the inquiry must be, what is the property worth in the market from its availability for valuable uses, both now and in the future. *Boom Co.* v. *Patterson*, 98 U. S. 403, 25 L. ed. 206."

"It is the present actual value of the land, with all its adaptations to general and special uses, and not its prospective or speculative or possible value, based on future expenditures and improvements, that is to be considered. *Appalachian Power Co.* v. *Johnson*, 137 Va. 12, 119 S. E. 253; *Fonticello, etc., Co.* v. *Richmond*, 147 Va. 355, 364, 137 S. E. 458.

In *Galax* v. *Waugh*, 143 Va. 213, 229, 129 S. E. 504, quoting from 10 R. C. L., page 175, we said:

"Everything which affects the market value is to be taken into consideration. The creation of noise and dust, the invasion of privacy, the deprivation of light and means of access, the burden of additional fencing and like matters are to be included, not by being added together item by item, but to the extent that, taken as a whole, they detract from the market value of the property."

Compensation should be awarded upon the basis of the most advantageous and valuable use of the land, "having regard to the existing business demands of the community or such as may be reasonably expected in the immediate future. The uses to be considered must be so reasonably probable as to have an effect on the present market value of the land. Purely imaginative or speculative value should not be considered. Compensation must be a full and perfect equivalent for the property." *Pruner* v. *State Highway Com'r*, 173 Va. 307, 4 S. E. (2d) 393.

Petitioner argues that the introduction of the map erroneously led the commissioners to value the tract upon the theory of what it might bring, planned and divided into building lots, rather than what the tract was worth in its present condition, and that evidence of the damage to the individual lots was speculative and imaginary because of dependence upon future developments, future improvements, future market and demands. It cites a number of cases from other jurisdictions, based on facts different from those here, to support its contention. Among the cited cases are *Pennsylvania, etc., Co.* v. *Cleary*, 125 Pa. 442, 17 A. 468, 11 Am. St. Rep. 913; *Gorgas* v. *Philadelphia, etc., Co.*, 215 Pa. 501, 64 A. 680, 114 Am. St. Rep. 974; *Kansas City, etc., Co.* v. *Splitlog*, 45 Kan. 68, 25 P. 202; and *Rock Island, etc., Co.* v. *Gordan*, 184 Ill. 456, 56 N. E. 810.

*Catlin* v. *Northern Coal, etc., Co.*, 225 Pa. 262, 74 A. 56, 57, distinguishes *Gorgas* v. *Philadelphia, etc., Co., supra,* by pointing out that the inquiry in that case was made on farm land in a rural district not immediately available for sale as building lots, holding that each case must be read and under-

stood in view of the situation at the time of the entry, and said:

"The test in every such case is, 'What was the market value of the land, at the time of the appropriation, for any available purpose?' If it was then available for sale as building lots, and had a market value for such purpose at the time of the entry it is proper to consider this element of value in determining what the property was then worth. All of our cases recognize that the use to which the land is best adapted may always be considered in estimating market value. If it has immediate value for sale as building lots, it would be a very harsh rule which would deny the owner the benefit accruing to him by reason of having his property so favorably located. As we view the case at bar, there is no doubt that a considerable portion of the land of appellee was available for sale as building lots, and that it had a market value as such at the time of the entry. Under these circumstances it was proper to consider the present value of the land for this use at the time of the appropriation. Of course, future and speculative value as a lot proposition could not be considered, and as we read the testimony, this rule was not violated."

■ We think it is proper that each case should be considered under its own peculiar circumstances. Exceptional circumstances will modify the most carefully guarded rule. It is not contended here that the landowners were entitled to recover for their property as platted land; but that they were entitled to show by the map the capabilities of the land, and that its susceptibility to platting in the manner proposed made it more valuable than it would otherwise be.

In *Ohio Valley Ry., etc., Co.* v. *Kerth*, 130 Ind. 314, 30 N. E. 298, under circumstances somewhat similar to those here, it was held that it was not improper to allow in evidence a plat illustrating the adaptability of a tract of land for subdivision, its size, location and topography.

In *Calumet River Ry. Co.* v. *Moore*, 124 Ill. 329, 15 N. E. 764, 767; *Thornton* v. *Birmingham*, 250 Ala. 651, 35 So.

(2d) 545, 7 A. L. R. (2d) 773; and in *United States* v. *.15 Of an Acre of Land, etc.* (Dist. Ct. Maine, 1948), 78 F. Supp. 956, the admission of a plat was held to be of probative value in visualizing a practical method of development for the purposes for which the property was best adapted.

To ascertain the damages from an easement imposed upon a tract of land adaptable for subdivision development, one must know something of the elements of damage to the component parts of the tract; that is, the effect of the easement upon the adaptability of the residue of·the tract for subdivision development. Admittedly, the value of the tract here involved is based upon its peculiar adaptability to subdivision into lots. It is undisputed that the 1940 plat set out the basis of the most advantageous and valuable use of the tract, having regard to the business demands of the community immediately before the taking, or such as might have been reasonably expected in the immediate future. It was not made for the purpose of boosting the value of the tract, but for a development prevented by circumstances beyond the control of the landowners.

The easement affected the size and shape of the tract for development. It rendered one and three quarters acres unavailable for use by the landowners. It necessitated a change in the location of the streets, the shape and location of the lots different from that originally planned, and lessened the value of the component parts of the tract, thereby· reducing the value of the property as a whole. It is true that the damages should not be added up lot by lot; for instance, by awarding so much for this one and so much for that. The damage should be considered from the standpoint of injury to the value of the property as a whole, taking into consideration the elements affecting its adaptability for development as a subdivision.

We think the map was useful and material in illustrating how the taking of the easement and the construction and operation of the power line changed the present and immediate situation with respect to the development of the

tract and thereby affected both the present and immediate future use of the entire tract.

The opinion evidence as to the damage to the individual lots, while stated in too much detail, was given in justification and by way of analysis to support the estimate made of damage to the property as a whole. It was not incompetent merely because the witnesses undertook to analyze and state the elements making up the amount of damages to the whole property. A landowner is allowed to show the circumstances which make up the elements of damage to his property. He is entitled to show that a portion of it will be less valuable and how much less valuable, provided that consideration is given to the property as a whole. An opinion without reason or grounds to support it is worth little. *Richmond* v. *Kingsland, etc., Corp.*, 157 Va. 619, 626, 162 S. E. 194.

The undisputed evidence was that the tract possessed, prior to the taking of the easement, the greatest adaptability and availability for subdivision into residential lots of very high value in a most desirable neighborhood, and that the taking and use of the easement damaged it to an extent as great, if not greater, than the award of the commissioners. The only contradiction as to the amount of the award was that produced before the trial court upon the hearing on the exceptions to the report of the commissioners. The petitioner awaited the result of the decision by the commissioners, and thereafter, because of dissatisfaction with the result, sought to bolster its position by evidence available to it for prior production. Under the circumstances the additional evidence is entitled to little consideration.

The finding of commissioners in condemnation proceedings is entitled to great weight and is not to be disturbed unless shown to be erroneous by clear proof that it is based upon erroneous principles, or that the amount allowed is so grossly inadequate or excessive as to show prejudice or corruption on their part. This is so because the commissioners may base their finding upon facts obtained

by their own view of the property, which do not appear in the record. *Kornegay* v. *Richmond*, 185 Va. 1013, 1024, 41 S. E. (2d) 45; *Talbot* v. *Norfolk*, 158 Va. 387, 393, 163 S. E. 100; *Hannah* v. *Roanoke*, 148 Va. 554, 139 S. E. 303; *Fonticello, etc., Co.* v. *Richmond, supra; Barnes* v. *Tidewater Ry. Co.*, 107 Va. 263, 58 S. E. 594.

Here petitioner disclaims any attack upon the qualifications and integrity of the commissioners and any claim that they were actuated by prejudice, fraud or improper motives.

The evidence before the commissioners amply supports their award. It is obvious, from their testimony and the amount of the award, that they did not subscribe to the reasoning and analysis of the real estate witnesses, who estimated the damages to the whole tract to be from $27,500 to $32,500, based on their opinion of the damage to individual lots. It is equally clear from their testimony that they restricted their consideration of the 1940 map to a showing of the use for which the land was best adapted, and that they were not under any misapprehension with respect to the principle that it was their duty to consider the damage to the property as a whole.

Our conclusion on the principal question, and upon the admissions of petitioner, makes it unnecessary to consider the assignment that the award was grossly excessive. Regardless of the conduct of the trial court upon hearing the exceptions to the commissioners' report, the confirmation of that report was entirely proper.

We find no merit in the complaint that the trial judge led the commissioners into answers supporting their report. The questions directed to the commissioners were designed to bring out the principles upon which their award was based. However, the learned trial judge did improperly subject a witness on the question of the excessiveness of the award to a severe and unjustifiable cross-examination with respect to an entirely collateral matter, and intemperately expressed his opinion as to the propriety of the conduct of assessors and courts which did not follow his view of the

proper course to be pursued in the assessment of lands for taxation. The expressions and conduct of the trial judge, under the circumstances complained of, were out of place, uncalled for, and subject to just criticism. Since they had no effect upon the report of the commissioners theretofore rendered, it cannot be said that the cause of the petitioner was prejudiced.

Taking all things in consideration and giving the finding of the commissioners the consideration to which it is entitled, we are of opinion that no reversible error has been shown. The judgment of the trial court is affirmed.

*Affirmed.*