# Richmond

## Virginia Electric and Power Company v. John H. Marks.

November 30, 1953.

Record No. 4116.

Present, All the Justices.

The opinion states the case.

*Hunton, Williams, Anderson, Gay & Moore, Ralph H. Ferrell, Jr., E. Milton Farley,* III and *T. Justin Moore,* for the plaintiff in error.

*M. J. Fulton,* for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

This is a condemnation proceeding instituted by the Virginia Electric and Power Company, a public service corporation, against John H. Marks and a number of other defendants, owners of several tracts of land, for the purpose of acquiring a perpetual easement or right of way over their lands, for the construction, operation and maintenance of its electric power transmission lines. Code of Virginia, 1950, § 25-27. This appeal, however, concerns only the easement sought over land owned by the appellee, John H. Marks. That easement extends a distance of 3,102.6 feet in length, is 150 feet wide, and embraces 10.7 acres.

Five commissioners were duly appointed, sworn, and fully and carefully instructed, without exception. They met upon the land of Marks, heard the evidence of witnesses, and unanimously reported to the court on March 1, 1950, that $3,475 was just compensation for the interest or estate in the 10.7 acres of land taken, and that damages to the residue of the tract, beyond the peculiar benefits that would accrue to the landowner from the construction and operation of the transmission lines amounted to $3,475, a total award of $6,950.

Appellant paid the full amount of the award into court on March 2, 1950. It then entered upon the property involved and began the construction of its transmission lines.

On March 30, 1950, appellant filed exceptions to the commissioners' report praying that the award be set aside

on the grounds that it was grossly excessive and speculative; that improper evidence was heard and considered by the commissioners; and that the commissioners had arrived at their award "in an improper manner and without due consideration of the instructions by the Court." On July 5, 1950, the trial court heard the testimony of the five commissioners called as witnesses by the appellant to explain why they ascertained the amounts fixed in their award and the method by which they arrived at said amounts.

Argument on the exceptions was heard on September 9, 1950, and on August 13, 1951, the trial judge advised the parties that he was of opinion to overrule the exceptions and confirm the award. Marks thereupon demanded payment of interest upon the award from March 30, 1950, until paid, to which appellant objected. After hearing argument upon that question, the trial court, on January 30, 1952, rendered a written opinion allowing interest from June 1st, 1950, that is, from a date three months after the filing of the commissioners' report. The final order confirming the award and providing for the allowance of interest was entered on March 28, 1952.

Appellant, in its brief, makes no attack upon the qualifications and integrity of the commissioners, and disavows any claim that the award is so grossly excessive as to indicate prejudice or corruption on their part. In its argument before us, it makes no complaint as to the amount of their award of $3,475 for the estate or interest in the property taken. It contests only the amount of the award for damages to the residue of appellee's property, the method used in arriving both at the amount of said damages and at the value of the land taken, and the allowance of interest on the total award.

We are asked to reverse the judgment of the trial court upon the grounds that three of the commissioners considered speculative evidence of the adaptability of the land in question for a swimming lake; that the commissioners, in disregard of the instructions of the court, yielded their

own fixed opinions as to the amount of damages to the residue of land in the tract not taken, in order to make a compromise or quotient award; and that since the appellant had paid the full amount of the award into court, the allowance of interest thereon was erroneous.

The tract of land over which the easement lies contains about 95.1 acres, which front on the south of Midlothian Pike, U. S. Highway No. 60, approximately three miles from the City of Richmond, Virginia. The front portion of the tract, that which lies next to Highway No. 60, is higher than its southern extremity. The lower portion is described as being wet and soggy, with a stream fed by a spring running through it. The land was being used for business, residential and agricultural purposes at the time of the institution of this action, and was said to be adaptable and available for subdivision purposes.

The easement lies near the western side of the tract and separates 11.7 acres on its extreme western side from the remainder of the property.

Two witnesses testified on behalf of the appellant before the commissioners. Thomas W. Clark estimated the value of the land taken in the 10.7 acres easement at $1,373 and damages to the residue of the tract at $1,090.50, or total compensation and damages $2,463.50. A. T. Harvie estimated the value of the easement at $2,510.00, and the damage to the 11.7 acres at $292.00, a total of $2,802.00.

Testifying on behalf of the landowner were seven witnesses, including Marks. A. C. Harris said that the construction and operation of the transmission lines over the easement proposed to be acquired by appellant would separate 11.7 acres from the rest of the tract and render that acreage practically worthless. He valued the 95½ acres at $400 an acre, that is, with a value exceeding $38,000. He also said that the value of the entire tract would be decreased at least one-third, and, therefore, the compensation for the property taken and the damage to the remainder of the property should be "about" $13,000. C. E. Pease estimated

the total amount of compensation and damages at $16,650. He, too, thought that the 11.7 acres would be almost worthless after the transmission lines were built. He said the whole tract was worth close to $50,000, and that its entire value would be lessened by one-third. W. B. F. Johnson, Jr., valued the easement over the 10.7 acres at $5,000, the damage to the 11.7 acres at $4,400, and damages to land east of the easement at $5,000, a total of $14,400. John L. Holt, Jr., valued the land taken for an easement at $4,575, and damages to the land outside the easement at $15,000, a total of $19,575. R. T. Holly thought that the easement over the 10.7 acres was worth approximately $3,210, and that damages to 75 feet of land on each side of the easement would amount to $2,100, a total of $5,310.

J. E. Flippo, an operator of a swimming pool, said that the lower part of the tract was an ideal spot for a public swimming pool, that it was basin-like in shape, had good springs to feed it, and required only a dam at the lower end. He, together with C. E. Pease and John H. Holt, Jr., thought it peculiarly adaptable and available for such a purpose, and that the pool could be established and put in operation quickly.

The owner, John H. Marks, testified that he bought the land in 1942, for the purpose of developing the front end for business purposes and the back end for amusement purposes, including a swimming lake.

The parties are not in dispute concerning the principles governing the taking of property in condemnation cases. *Talbot* v. *Norfolk*, 158 Va. 387, 163 S. E. 100; *Kornegay* v. *Richmond*, 185 Va. 1013, 41 S. E. (2d) 45; *Appalachian Elec., etc., Co.* v. *Gorman*, 191 Va. 344, 61 S. E. (2d) 33.

The commissioners were instructed that in estimating the value of the land taken "all the capabilities of the property and all the uses to which it may be applied or for which it is adapted are to be considered;" that if "because of its surroundings, or natural advantages, or its intrinsic character, the property is peculiarly adapted to some particular

use, all the circumstances which make up this particular adaptability may be shown and the fact of such adaptation be considered;" that there should be considered "all uses to which it might be reasonably adapted," but that such uses "must be so reasonably probable as to have an effect on the present market value of the land;" and that no regard should be given to "purely imaginative or speculative value." As to damage to the residue of the land, they were instructed "to allow only such damages as, from their judgment and from the evidence, they may reasonably anticipate will result from the construction, operation and maintenance" of the transmission lines in question. They were further advised that they should "consider all the evidence presented," and were "not bound by the opinion of experts or by the apparent weight of evidence," but might give their own conclusions.

Instruction O reads as follows:

"The Court instructs the Commissioners that it is not necessary that all of the Commissioners shall agree upon the report to be made to the Court, but a majority of you have the right to reach a conclusion and file your report setting forth that conclusion. If the minority desires to do so, they may file a minority report."

Instruction G further said:

"The Court instructs the Commissioners that in ascertaining the damages, if any, to that portion of the owner's land outside of the right of way herein sought to be condemned, you shall award the owner the difference between the market value of the same at the time of the taking of the right of way and its market value after the right of way has been taken and considering all the uses which the Power Company may make of it."

The commissioners had wide discretion when they came to consider the amount to be awarded. It was their duty to weigh the evidence in connection with their view of the land, and draw their own conclusions in the light of the surrounding facts and circumstances. *Talbot v. Norfolk,*

*supra,* at page 393. They were entitled to consider evidence of the adaptability of the land for a lake, if its surroundings, natural advantages, and capabilities for such purpose were so reasonably probable as to have an effect on the market value of the land at the time of their appraisal.

In applying the established principles to the evidence, it is clear, we think, that the evidence amply supports the commissioners' award. The award, both as to the land taken and damages to the residue, is well within the limits of the amounts stated by several witnesses. The commissioners saw and heard the witnesses, and had the further advantage of a view of the land. Certainly the amounts fixed are not grossly out of line.

It is next argued that the commissioners disregarded the instructions of the court and yielded their own fixed opinions as to the amount of the award in order to make a compromise or quotient award. It appears from the evidence that at the beginning of their deliberations, three of the commissioners thought the total award should be "around $5,000 or $5,500;" that another thought the land-owner was entitled to $12,000; and the fifth fixed the amount at "about $13,000." Being unable to come to an agreement after a long discussion, the commissioners reported to the court that there was a division, and inquired if they could make a majority and minority report. They were informed that they could do so in accordance with Instruction O. They then returned to their room for further deliberation, and after considerable further discussion, the three commis-sioners who favored a lower figure raised the amounts they first favored, and the two who advocated a higher award lowered theirs. Then for the purpose of arriving at a work-ing basis, the commissioners added the five amounts which reflected the figures each commissioner thought the award should be, divided the aggregate sum by five, and the result was the sum of $6,950.

We are not told the exact figures used in making the addition, nor how much each commissioner raised or lowered

his original valuation. There is no evidence that the commissioners agreed to be bound by the quotient reached as the result of their procedure. That they were free to accept or reject it is evident from their subsequent discussions. As to that, one commissioner said that while he first favored an award of $5,500, he agreed that it should be $6,950, after his associates "brought out some other points." Valuing the land on March 1, 1950, at $25,000, it was his opinion that it would be worth $6,950 less after the construction of the transmission lines. All of the commissioners, after consultation and conference with each other, agreed on the total award of $6,950.

One commissioner said he gave only a little consideration to the adaptability of the land for a lake, and it caused him to increase his figures only a little bit. Another commissioner said he thought the land could be used for a pond or a resort of some type, and considered its availability in making the award. The third commissioner said that they did not give much consideration to the evidence about the lake, and he thought that it increased the value of the land "a small sum." The fourth said that while the adaptability of the lake had some bearing on the award, he did not "consider it too much," although it "had some bearing, but not too much."

It is further urged that the identical sums fixed for the property taken and for damages to the residue bore no relation to what any commissioner considered "just compensation." The commissioners said that they did not fix a price per acre for the land taken. However, $3,475, an average price of about $324 for each of the 10.7 acres, was well within estimates placed upon it by witnesses on behalf of the landowner. In considering the damage to the 11.7 acres and the residue of owner's land outside of the easement, they thought that the difference between the market value of the same at the time of the taking of the right of way and immediately thereafter amounted to about the same

sum awarded for the land taken, and consequently the total amount of $6,950 was divided in the manner reported.

According to the evidence, the commissioners earnestly tried to arrive at proper figures for the property taken and damages caused to the residue, according to the court's instructions, and, after full consideration of all the facts and circumstances, finally reconciled their views and deliberately agreed upon the award returned.

A quotient award, like that of a quotient verdict, implies an agreement in advance among commissioners or jurors that each will put down the amount he thinks the award or verdict should be, the aggregate of such sums then divided by the number of commissioners or jurors, and the result reached shall be their award or verdict. 19 M. J., Verdict, § 8, page 491.

The question here raised was presented in the case of *Washington Luna Park Co.* v. *Goodrich*, 110 Va. 692, 696, 66 S. E. 977. In that case, we said that where jurors agree in advance that each shall put down the amount of his verdict, and the aggregate of the sums be taken, and divided by the number of jurors, and the quotient be their verdict, this invalidates the verdict. The evidence relied on in that case, as in this, to prove the fact of antecedent agreement was not produced, and the verdict was upheld. Here, the result was finally adopted as the deliberate judgment of each commissioner, after full discussion and without any prior agreement to be bound by it.

It is not unusual or unnatural for men of independent minds, composing a condemnation commission, to take different views of values. Consequently, they are frequently called upon to adjust their views to the views of their associates. If they undertake such adjustment with open minds and, after a full and fair discussion, give due consideration to the evidence, the opinions of their associates, and all of the factors involved, and without the sacrifice of their conscientious and deliberate opinion reach agree-

ment as to what their award should be, then their award is a valid award and not a quotient award.

In West Virginia, the same rule applies. *Miller* v. *Blue Ridge Transportation Co.*, 123 W. Va. 428, 15 S. E. (2d) 400; *Kelly* v. *Rainelle Coal Co.*, — W. Va. —, 64 S. E. (2d) 606.

The rule is well stated in 53 Am. Jur., Trial, § 1031, page 712:

"Limitations and Exceptions.—The invalidity of quotient verdicts depends not upon the method of arriving at the verdict, or the result reached, but on the previous agreement to be bound by the result of the quotient process. The test to be applied in determining the validity of a verdict which is attacked as a quotient verdict is whether the jury agreed beforehand to be bound by the result reached; the existence of such agreement is the test in both criminal prosecutions and civil actions. Where there is no agreement or understanding to be bound by the result before such a method is adopted or while it is in the process of execution, or if the means is adopted merely for the sake of arriving at a reasonable measure of damages or term of imprisonment, without binding the jurors by the result, the verdict is not objectionable. * * * "

See also 64 C. J., Trial, § 831, c, page 1035, and annotations, 52 A. L. R. 41, and 20 A. L. R. (2d) 958, where other authorities are cited.

The last assignment of error is to the action of the trial court in allowing interest on the amount of the award from June 1, 1950, three months after the date on which the report of the commissioners was filed, until the amount of the award should be paid to the appellee landowner, since appellant had promptly paid into the court the full amount of the award pending the disposition of its exceptions.

This precise question, based upon an identical state of facts, was presented in *Virginia Electric and Power Company* v. *Manfred Call, III, and others*, a companion case this

day decided by this court. In that case we expressly held that the allowance of interest, under the facts and circumstances noted, was proper and correct. There Mr. Justice Eggleston exhaustively reviewed the cases and the authorities, and set forth clearly the reasons for our conclusion.

Giving to the conclusion of the commissioners the consideration to which it is entitled, and finding no error in the rulings of the trial court, we are of opinion to affirm the judgment complained of, and it is so ordered.

*Affirmed.*