## Staunton

VIRGINIA ELECTRIC AND POWER COMPANY v. BETTIE PAULINE
POLAND PICKETT, ET AL.

September 14, 1955.

Record No. 4392.

Present, Eggleston, Spratley, Buchanan, Miller, Smith and Whittle, JJ.

The opinion states the case.

*Hunton, Williams, Gay, Moore & Powell; Ralph H. Ferrell, Jr.* and *E. Milton Farley, III,* for the appellant.

*Stilson H. Hall* and *Carleton Penn, II.,* for the appellees.

BUCHANAN, J., delivered the opinion of the court.

This is a condemnation case in which the condemner, Virginia Electric and Power Company, claims that the commissioners awarded the landowners excessive damages and that the trial court erred in refusing to set aside their report.

Two tracts of land are involved, one referred to as the Poland tract and the other as the Latham tract, located mostly in Loudoun county but partly in Prince William county.

Over each the Company takes a 100-foot right of way or perpetual easement on which to construct, operate and maintain its pole and tower lines for transmitting electricity, together with the right of ingress and egress to and from said right of way over any existing roads and if none reasonably convenient then over the property of the owners by such ways as reasonably convenient in order to construct and maintain the electric lines and their appurtenances, and other rights incident to these purposes, the Company to be liable for all damages resulting from the exercise of its rights of ingress and egress.

The Poland tract is said to contain 782 acres, bounded on the east by State Highway No. 705 and on the south by No. 701, with an additional tract said to be about 75 acres lying along the south side of No. 701. The 100-foot right of way extends across the 782-acre tract for a distance of 7,758.2 feet and contains 17.81 acres. For this the commissioners allowed $3,900, or $219.97 an acre, for the land taken, and $7,380 for damages to the residue, a total of $11,280.

The Latham tract according to the record contains about 185.49 acres. It is divided into two parcels by U. S. Highway No. 15

which runs north and south, the parcel east of the highway, 120 A, being the larger. The 100-foot right of way runs diagonally across parcel 120 A and the northeastern corner of 120 B for a total distance of 3,046.5 feet and includes 7.01 acres. For the land taken the commissioners allowed $2,100, or $299.57 an acre, and for damages to the residue $4,900, a total of $7,000.

The Company under its assignments of error contends that the commissioners disregarded the court's instructions and proceeded upon erroneous principles; and that their awards are so grossly excessive as to show prejudice.

In accordance with the statute, Code § 25-12, five disinterested freeholders were appointed as commissioners, all of whom served and signed the report. They were given written instructions, to which there was no objection, fully explaining their duties and telling them, among other things, that they should determine the fair market value of the land taken, and what that meant, together with the damages to the residue, if any, based on the difference between the market value of the same at the time of the taking of the right of way and its market value after the taking. They viewed the premises, heard the testimony of witnesses for both sides and made their report. The Company argues that the only competent and credible opinion evidence was given by its witnesses and that when the awards are measured by their testimony and by comparable sales, they cannot be justified. This requires an analysis of the evidence.

The Polands introduced seven witnesses who may be described and their testimony stated as follows:

Hutchinson, a farmer, had known the Poland land for forty years. He had read the condemner's petition and had been over the land within the week. The right of way went through four fields, highly productive and the best of the Poland farm. He was familiar with land sales in that locality and had made two appraisements for one of the banks in the county. He valued the 17.81 acres at $5,100 or approximately $300 an acre, and was of opinion that the residue of the farm would be worth $6,000 less after the construction of the transmission line, a total of $11,100.

Gossom, a dairy farmer, was owner of a 400-acre farm two miles from the Poland farm on which he had lived over thirty years. He was familiar with the value of land in that locality, knew of other property that had been sold and what people were asking for it. He thought the land in the right of way was worth $250 an

acre; that the difference in the selling price of the residue before and after the power line was built would be about $5,400; that when you cut a big field in two you naturally damage its value; that there were four fields that would be so cut up which were "the prime of the farm"; that such a right of way constitutes a nuisance because it has to be worked around every time you cultivate the land or harvest the crop. "It is there to be reckoned with every time you come along." He placed the total for the land taken and damage to the residue at $9,852.50.

Cox was a farmer, owning a farm about a mile from the Poland place, and had been the county farm agent for Prince William county for twenty-five years. He was familiar with land values and had seen farms sold in that community and knew about their productivity. He had ridden over the whole Poland farm about two weeks before. He thought the whole farm would bring $175 an acre. He valued the land taken, which he considered the best of the farm, at $250 an acre and estimated the damage to the residue at $5,500, as a conservative figure, a total of $9,952.50.

Smith owned a farm about four miles from the Poland farm, had lived in that community all his life and was familiar with the Poland land. He knew of properties around there that had been sold and was familiar with land values in that area. He thought the Poland farm north of No. 701 would be worth as a whole $200 an acre and "I figured the damages for the land would add about $300 more to that." He thought the total for the land taken and damage to the residue would be $500 an acre for the 17.81 acres, or $8,905. He also said that he thought the right of way would reduce by $50 an acre the value of the remainder which he thought comprised 822 acres, but it is uncertain from his evidence what he meant in that respect.

McCanless had hunted on the land and built roads on it. In 1950 he had offered to buy the farm for $125 an acre and at that time had walked all over it. He had owned a farm six or seven miles from the Poland place and sold it in 1944. He had appraised some five properties for a Middleburg bank within the last year and knew what people were asking for land in the community of the Poland farm. He thought the Poland land was worth $125 an acre, that the easement for the power line would depreciate the value of the residue ten per cent, and that for the land in the easement he "would want" $400 an acre. His figures were $7,124 for

the land taken and $9,552.38 for the damages to the residue, a total of $16,676.38.

Jenkins was cashier of a Leesburg bank and a farmer. He occasionally valued property for loan purposes for the bank and its customers and felt that he knew land values in Loudoun county fairly well. He knew the Poland land and had been on it the previous day. He thought the land in the right of way was worth about $300 an acre, "coming out of the middle of the field like this." He was of opinion that the difference in the fair market value of the farm before and after the taking was $10,800. He testified that "with a hundred-foot right of way across the center of the farm, when you try to farm it you have something in your way there forever, as long as you live, as well as danger to stock, danger to the people leaving the gates open and any number of things that make it a very objectionable thing when buying the property." His total was $16,143.

Poland, one of the owners, testified that the farm was productive and was then carrying 300 head of cattle. He thought the land in the right of way was worth $300 an acre and that the taking would reduce the value of the residue by fifteen per cent, making a total of $21,400.

The Company's witnesses before the commission were three real estate agents. The first, James, testified he had been in the real estate business twenty-two years and was familiar with the value of lands adjacent to the Poland farm. He and the other two walked over the right of way through the Poland property. He divided the right of way into three parts, valued 8 acres at $200 an acre, 6.31 acres at $100 an acre and 3.5 acres at $50 an acre. This, with ten trees outside of the right of way at $15 each, added up to $2,406 for the land taken. He then valued the residue, which he said was 752.5 acres, at $85 an acre, amounting to $62,220 (*sic*), and depreciated that five per cent to get $3,111 as damage to the residue for a total of $5,677 (*sic*).

The other two witnesses, Wolford, who had been in the real estate business ten years, and Riddle, who had been similarly engaged for eight years, followed the same general plan for valuing the 17.81 acres except they divided it into a greater number of parcels and valued the first parcel of 6.5 acres at $250 an acre and the other parcels at varying amounts down to $100 an acre. They differed from James, however, in their method of calculating damage

to the residue. They took a strip 100 feet wide on each side of the right of way and divided that into parcels corresponding to their division of the right of way. Wolford depreciated some of the parcels in the two strips at ten per cent, some at fifteen per cent and one not at all. Riddle depreciated all of them at twenty per cent of the values assigned to the different parcels in the right of way. Wolford arrived at a value of $3,087.50 for the land taken and $755 for the residue, a total of $3,842.50. Riddle placed the value of the land taken at $3,119.25 and damage to the residue at $993.65, a total of $4,112.

James testified that in estimating values he considered what he thought were comparable sales in the neighborhood, No. 1 made in 1952 at $133 an acre, No. 2 made in 1944 at $135 an acre and No. 3 in 1944 at $32.50 an acre. He said these were about the same quality of land as the Poland land but not in as good condition. Wolford did not think No. 3 was as good as the Poland land, some of which he said "is awful good land". He thought some of No. 1 was not as good as the Poland farm and some of it was, but he did not know about No. 2. Riddle thought No. 1 was "very comparable" to the Poland farm. James later testified before the court and commissioners to a sale of land across Highway No. 705 from the Poland land made in 1946 at $51.16 an acre, but he did not express any opinion as to whether the land involved was comparable to the Poland tract.

The same three witnesses testified that they applied the same methods in arriving at the value of 7.01 acres of the right of way through the Latham land and in fixing damages to the residue. James fixed the compensation for the land taken at $1,400 and damage to the residue $736, a total of $2,136. Wolford valued the land taken at $1,393.75 and damage to the residue at $351.88, a total of $1,745.63. Riddle appraised the land taken at $1,252 and the damage to the residue at $530.60, a total of $1,782.60.

The only evidence offered by the Latham owners was the testimony of Mrs. Latham that the property fronted on both sides of U. S. 15, she said for a quarter of a mile but the record shows about one-half mile, and that they had planned to locate a permanent home on the east side on the only highland available on the road frontage. There was evidence from a Company witness that a 300-acre tract in the same neighborhood had been sold at about $235 an acre but no date was given.

On their view the commissioners could make comparison with the Poland tract and the evidence shows that the same procedures were followed and the same considerations applied with respect to the Latham tract as with the Poland tract.

As the Company states in its brief, the controlling principles with respect to setting aside awards of condemnation commissioners are not in dispute. The finding of the commissioners is entitled to great weight and is not to be disturbed except upon clear proof that it is based on erroneous principles or so grossly inadequate or excessive as to show prejudice or corruption. The commissioners may base their findings on facts obtained by their own view of the property not appearing in the record. *Appalachian Elec. Power Co. v. Gorman,* 191 Va. 344, 357-8, 61 S. E. (2d) 33, 40.

There is no evidence that the commissioners in the present case disregarded the court's instructions and proceeded on erroneous principles unless that is a necessary inference from the amount of the awards.

In the Poland case the amount fixed by the commissioners for the land within the right of way is substantially less than the value fixed by six witnesses for the owners and not greatly in excess of the value fixed by two of the Company's three witnesses. We cannot say that after going upon the land the commissioners acted unreasonably in adopting the view that this right of way running through four of the best fields of the farm should be valued as a whole rather than that it should be divided into small parcels and different values assigned to different parcels.

The main difference between the witnesses on the one side and those on the other lies in their opinions as to the damage to the residue of the farm. It does not appear as a matter of law that the witnesses for the Company were more competent or reliable than were those for the landowners to speak on that point. It is to be observed that there was a material difference among the three witnesses for the Company as to the method of fixing the damage. James, the most experienced of the three, was of opinion that the whole farm was damaged and accordingly depreciated it on the basis of $85 an acre for 752.5 acres. If he had based the depreciation on the amount of $125 an acre, which the Polands had been offered only three years before, and on the correct acreage of 764, and had applied a depreciation rate half way between his estimate and that of the lowest witness for the Polands, he would have ar-

rived at an amount very close to that fixed by the commissioners. As it was, his result was about three times the amount fixed by the other two.

These other two witnesses limited their finding of damage to a 100-foot strip on each side of the right of way, although one of them stated "it does depreciate the farm to a certain extent, but I would not say that depreciation is too much." That method did not find favor with the one commissioner who testified. He said that it did not appeal to him as a logical method, but was arbitrary, and 500 or 1,000 feet could as well have been selected; that it seemed to him it was better to do as the commissioners did, walk over the property and view it and try to reach a reasonable conclusion.

■ Evidence as to other sales is admissible if they are close enough in time and on a free and open market so as to permit a just comparison. They may be misleading if made under such circumstances as not accurately to reflect the value of the property sold. 18 Am. Jur., Eminent Domain, § 351, p. 994; 6 Mich. Jur., *Idem.* § 88, p. 776; *Seaboard Air Line Railway* v. *Chamblin*, 108 Va. 42, 45, 60 S. E. 727, 729; Annotation, 118 A. L. R. 698. The difference in time, the variant prices and the undisclosed circumstances of the sales offered for comparison in the present case do not allow them sufficient weight to establish that the awards in controversy were grossly excessive.

■ Among the instructions given without objection, and conceded by the Company to be correct, was one which told the commissioners that they were not bound by the opinion of experts or by the apparent weight of the evidence but could give their own conclusions based upon their view of the land. See *Barnes* v. *Tidewater Railway Co.*, 107 Va. 263, 267, 58 S. E. 594, 596; *Kornegay* v. *City of Richmond*, 185 Va. 1013, 1024, 41 S. E. (2d) 45, 50; *Appalachian Elec. Power Co.* v. *Gorman, supra.*

That rule is not to be considered as turning commissioners loose to take arbitrary or capricious action and return awards not related to the value of the property. Their awards are to be measured by the evidence and if the evidence clearly shows them to be unreasonable they should be set aside. In this case there was substantial evidence from apparently qualified sources to support the awards and when to that fact is added the information gained by the commissioners from their view, their awards, confirmed as they

have been by the trial court, cannot fairly be said to be so grossly excessive as to show prejudice.

The Company further contends that the awards should be set aside because they were quotient awards; *i.e.*, that the commismioners agreed in advance to add their separate figures, divide the total by the number of commissioners and report the result to their award.

The invalidity of a quotient award, like that of a quotient verdict, results not from the use of that method but from the previous agreement to be bound by the result whatever it might be and without any subsequent consideration. If the method is adopted merely for the sake of arriving at a reasonable measure of damages, and if after the amount is ascertained, the commissioners deliberately agree to and adopt it as being fair and just, it is not objectionable. *Virginia Elec. and Power Co.* v. *Marks*, 195 Va. 468, 78 S. E. (2d) 677, 39 A. L. R. (2d) 1201; *Miller* v. *Blue Ridge Transp. Co.*, 123 W. Va. 428, 15 S. E. (2d) 400; 89 C. J. S., Trial, § 472, p. 113; Annotations, 52 A. L. R. at 44, 20 A. L. R. (2d) at 958.

The only evidence as to the procedure of the commissioners was given by one of them, called by the Company to testify and referred to in its brief as chairman of the commission. He said that the commissioners discussed the testimony of the witnesses for some time among themselves and a suggestion was made that each commissioner write down his opinion as to the amounts for the land taken and the damage to the residue, "average them up and that would be it;" that while none of the commissioners had the same answer, there was not a wide difference between the high and the low. He said that on a controversial issue it was hardly to be expected that five men would come up with identical figures, and in order to resolve the variation they used that method of averaging and rounding them out; that had there been a very wide variation, "or if we had felt that our own opinion was out of line with the average, I am sure that the matter would have been raised and we would have discussed the matter at even greater length, but there was not, and so we arrived at this composite figure which we all agreed to."

He testified that he tried to give weight to all he heard in the testimony, and that they saw on their view of the property a number of things not mentioned in the testimony, or in the hearing, and that he read some things on the blueprints that had not been men-

tioned. Under questioning by the court he said that he considered the awards to be fair and impartial; that if one of the commissioners had put down a figure that would have brought the awards way up he would not have agreed to it, and he pointed out that their findings were well within the range of the values shown in the evidence.

Some expressions in the testimony of this witness, if considered separately from their context, may be used to support the argument that there were quotient awards in the objectionable sense of involving an agreement to be bound by the result. Considered as a whole his testimony refutes that contention and demonstrates that the awards reflect the considered judgment of the commissioners, and not a result determined by lot. This is emphasized by this testimony of the witness in addition to that quoted in the dissenting opinion:

"Q. And the testimony of the witnesses, including the witnesses for the Power Company and the witnesses for the Poland heirs as to those two factors [land taken and damage to residue] is what you Commissioners based your award on, is that right?

"A. Including our own opinions as the result of viewing the property."

\* \* \* \* \* \* \*

"Q. Mr. Brown, you officially signed an award for $3900 compensation for the 17.81 acres of land. Was that the valuation that you placed on the 17.81 acres of land when you brought your award back into the clerk of the Court that evening?

"A. I agreed to that figure.

"Q. Is that also true of the $7,380 item of damages?

"A. That is right."

\* \* \* \* \* \* \*

"Q. Might I ask Mr. Brown whether the figure set out for the Latham property were concurred in by you as your valuation is in the value of the land, the damages to the residue and the total?

"A. Yes."

\* \* \* \* \* \* \*

"We used our judgment. We were so instructed by the Court,

as well as the evidence that was presented. I do not know how to answer it any differently than that."

His testimony in its entirety satisfactorily establishes that the method employed did not involve subordinating the opinions of the commissioners to the "fall of the dice," but resulted in awards which represented their reasoned judgment.

The orders appealed from are accordingly

*Affirmed.*

EGGLESTON, SPRATLEY and WHITTLE, JJ., concurring.
MILLER, J., dissenting.
SMITH, J., dissenting in part.

WHITTLE, J., concurring.

I am in full accord with the views expressed and the result reached in the majority opinion. However, I cannot condone by silence the practice employed in this case and in others which have come before us from some jurisdictions in the State, where the parties are permitted to summon the commissioners to explain their report and testify as to how they arrived at their award, and to impeach such award by attempting to show that the commissioners misunderstood or misapplied the court's instructions.

In Virginia the right of eminent domain is recognized and preserved in our Constitution (§ 159, Virginia Constitution, 1902), and has been exhaustively treated by statute (Vol. 5, Title 25, Eminent Domain, Virginia Code, 1950), which supersedes the common law. *Hicks* v. *Anderson,* 182 Va. 195, 28 S. E. (2d) 629.

Generally there are two methods by which damages to lands sought to be condemned are ascertained. In some jurisdictions the jury system is employed while in others commissioners are appointed to ascertain the damages. Except in condemnation proceedings instituted by the Federal Government in the courts of this State, under Code, § 25-56, etc., and under some special acts, where provisions are made for a jury trial, the amount of the just compensation due the property owner is fixed by commissioners appointed by the court. Code, § 25-12. The latter section provides that if a *bona-fide* effort to purchase the property fails then upon application the court shall "appoint five disinterested freeholders, residing in such county or city, any three or more of whom may

act, for the purpose of ascertaining a just compensation", etc. Section 25-13 provides that the court shall set a date and hour for the meeting of the commissioners, and § 25-16 prescribes the oath which shall be taken by them. Section 25-17 provides that "the commissioners, after viewing the property * * * affected by the construction and operation of the works of such company, and hearing such proper evidence as may be offered by the parties touching the compensation and damages, shall ascertain what will be a just compensation * * * and shall make report to the following effect * * *." A form of the report is thereinafter set out in detail. Section 25-18 provides that "the report * * * shall be * * * returned to the clerk's office * * *, where it shall remain for at least thirty days, after which, unless good cause be shown against the report, the same shall be confirmed * * *."

We have held that the report of commissioners is allowed great weight and if no illegality or irregularity appears on its face it is *prima facie* evidence of the propriety and correctness of the award and it must be confirmed "unless good cause be shown against the report". *Kornegay* v. *City of Richmond*, 185 Va. 1013, 41 S. E. (2) 45. We have also held that where commissioners have been instructed, as in this instance, without objection from either party, as to the elements of damages to be considered by them, and they have made a report in accordance with such instructions, neither party should complain that they did what they were told to do. *Tidewtater R. Co.* v. *Cowan*, 106 Va. 817, 56 S. E. 819.

In the instant case the formalities of the above statutory proceedings were complied with, and within thirty days after the reports had been lodged in the clerk's office the condemner filed its exceptions. In them it prayed that the commissioners be required to appear in court "for the purpose of explaining their aforesaid report and advising the court as to how they made their awards."

Trial courts charged with the duty of selecting commissioners, as contemplated by statute, usually pick the highest type (freehold) citizens. Commissioners so selected serve not of their own volition but because the court has ordered them to do so. Ordinarily when commissioners are being selected, if there is valid objection raised by either party to a commissioner, his name is withdrawn and another selected. This usually results in the appointment of a commission free from objection.

It is inconceivable that after these precautions have been taken,

and a commission free from objection has met, considered the evidence, mandatorily viewed the premises, heard the instructions of the court, the permissible argument of counsel, and, under oath, returned its award to the clerk's office, that they should, in the absence of some alleged fraud, chicanery, or corruption, be required to appear before the court "for the purpose of * * * advising the court as to how they made their awards * * *." There is no provision in the statute authorizing such practice.

Statutes conferring the power of eminent domain are to be strictly construed and the authority conferred must be carefully observed. *Charles* v. *Big Sandy &c. R. Co.*, 142 Va. 512, 129 S. E. 384. In the construction of such statutes every reasonable doubt is to be resolved against the right; any rights claimed must be affirmatively embodied in the statute, as silence is negation; and unless both the spirit and the letter of the statute clearly confer the right claimed it cannot be exercised. *School Board* v. *Alexander*, 126 Va. 407, 101 S. E. 349. See *Richmond* v. *Childrey*, 127 Va. 261, 103 S. E. 630; *West* v. *Anderson*, 186 Va. 554, 42 S. E. (2d) 876.

As a matter of course, for reasons of public policy, commissioners and jurors should be kept free from every suspicion of influence by any party to the litigation. *New River &c. R. Co.* v. *Honaker*, 119 Va. 641, 89 S. E. 960, Ann. Cas. 1917C 132. In this instance there was no suspicion of influence or misconduct of any kind alleged nor attempted to be shown.

The reports filed in this case needed no "explaining"; they were perfectly plain. Both reports responded in the language of the statute (§ 25-17) and answered all inquiries directed. Yet, Stanley N. Brown, one of the commissioners, was permitted to be called as a witness by the condemner for the ostensible purpose of explaining the report and "advising the court as to how they made their awards". The harrowing examination of this commissioner covered sixteen printed pages and was a clear attempt to show that the commissioners had misunderstood or misapplied the instructions of the court.

The only color of authority for such practice is the language in Code, § 25-18, that "unless good cause be shown against the report, the same shall be confirmed". *Crawford* v. *The Valley R. Co.* (1874), 25 Gratt. (66 Va.) 467, 470; *Washington, etc. R. Co.* v. *Switzer* (1875), 26 Gratt. (67 Va.) 661, 664. In an attempt to show "good cause * * * against the report", or that the report is based upon erroneous principles, the practice of examining com-

missioners has grown up in some jurisdictions of the State. The propriety of such practice has never been fully discussed or inquired into by this court. The nearest direct approval of the practice is the dictum in *Lanford* v. *Air Line Ry. Co.*, 113 Va. 68, 74, 73 S. E. 566, where the court, after having held that the point was not properly preserved by a bill of exceptions, said "* * * (T)his evidence was admitted for the purpose only of explaining and making clear the report of the commissioners, and for that ruling authority is abundant." However, in 6 M. J., Eminent Domain, § 78, p. 766, the dictum in the *Lanford* case is cited as the sole authority for the proposition that the testimony of commissioners is receivable for the purpose of explaining and making clear their report. Even the *Lanford* case does not contemplate an examination for any other purpose.

Undoubtedly the practice of examining commissioners for the purpose of explaining or even impeaching their award has been, without objection, impliedly approved in a number of Virginia cases. *Tidewater Ry. Co.* v. *Cowan, supra*, (report confirmed; judgment affirmed); *Appalachian Power Co.* v. *Johnson*, 137 Va. 12, 26, 27, 119 S. E. 253, (report confirmed by lower court, but award set aside on appeal on testimony of commissioners); *Chairman Highway Commission* v. *Fletcher*, 153 Va. 43, 149 S. E. 456, (report confirmed but judgment reversed); *Talbot* v. *City of Norfolk*, 158 Va. 387, 393, 163 S. E. 100, (report confirmed, but judgment reversed on appeal on testimony of commissioner); *Kornegay* v. *City of Richmond, supra*, (report confirmed, judgment affirmed). In my opinion, in so far as these cases lend approval to the practice of summoning commissioners for the purposes indicated they should be disapproved.

Apparently the majority rule outside of Virginia is that the impeachment of a commission's award is placed upon the same basis as the impeachment of a jury's verdict, in which a juror may not be examined as to whether he or his colleagues properly applied the court's instructions. 29 C. J. S., Eminent Domain, § 317, p. 1353. The courts generally take the view that a report may be set aside upon the showing that the commissioners adopted erroneous principles. 29 C. J. S., Eminent Domain, § 309, pp. 1341-42. But this should appear from the transcript of the evidence in order to ascertain whether or not improper evidence had been admitted, and for the further purpose of ascertaining whether the damages were speculative as alleged.

It is true that under our procedure the commissioners are not bound by the opinions of experts or by the apparent weight of the evidence and may view the property affected and form their own opinion of the amount of compensation due. *Kornegay* v. *City of Richmond, supra.* But in so doing, what elements they should consider and what principles they should apply are matters to be controlled by the court's instructions.

There is, however, no express provision in our statute which authorizes a party to the litigation to summon commissioners and subject them to unreasonable examinations regarding every detail of their report for the purpose of impeaching their award, as was done in this case. Such practice is not permitted in some courts of this Commonwealth, and in my opinion it should not be sanctioned by this court.

EGGLESTON and SPRATLEY, JJ., concur in this opinion.

MILLER, J., dissenting.

Without commenting upon the question of whether or not it should be permissible to call and examine a commissioner for the purpose of impeaching his award, I cannot, upon the evidence contained in this record and admitted without objection, agree that these awards are not quotient.

The majority opinion has failed realistically to appraise the testimony bearing upon this phase of the case. Commissioner Brown was the only witness who testified as to the procedure adopted by the commissioners to arrive at the awards. That the full import and meaning of what he said about how the awards were made may be realized, the material parts of his testimony bearing upon this question are set out below:

"Q. Do you recall there were three items, first, compensation for the rights taken, and their idea was $3900, and then damages to the residue resulting from the taking of $7,380 and a total figure of $11,280? Could you tell us and advise his Honor especially how you arrived at the award that we refer to there, and first, tell us about the item of compensation, and then tell us how you formulated the award as to the damages?

\*　　\*　　\*　　\*　　\*　　\*　　\*

"A. We discussed the testimony of the witnesses for some time

among ourselves, and a suggestion was made by one of our group —I cannot remember which one made the suggestion—that we write on a piece of paper our opinion as to these three figures, so we all did so and tabulated the five answers for each of the three figures, took an average and then rounded out the average to a few dollars one way or the other to make it come out more or less even numbers, and that is the way we arrived at the answer.

"Q. Was it agreed or was it suggested and later followed that you should average, add up the figures and then average them out and make that your award?

"A. As I say, it was suggested by one of our group that we felt that procedure should be followed, that we would write down each of our own answers, average them up and that would be it.

"Q. So it was suggested and agreed to by all five of the Commissioners that that procedure would be followed and then you actually did follow that procedure, is that correct?

"A. That is correct, as I say, after we arrived at the average, we made a slight variation one way or the other. I cannot remember now which way it was, but it was not material.

"Q. It was just to round off the figures, is that right?

"A. Yes, sir.

\* \* \* \* \* \* \*

"Q. What I am trying to find out, then, is how did you get $7,380, unless—

"A. That was the average of five figures.

\* \* \* \* \* \* \*

"Q. I want to focus your attention on the award in the Latham case, which is the next exhibit there that you see, and I will just ask you this question. Did the procedure that you have described when I had you on examination a moment ago as to the way the award was formulated in the Poland case approximate the procedure which was agreed to and followed by the Commissioners in making the award that you see here in the Latham case of compensation of $2,100, damages of $4,900, and a total of $7,000?

"A. Yes, sir. We used the same procedure for both cases.

"Q. And in getting up your own individual figures which you put in the pot, so to speak, you followed the same general formula

as to the determination of the damage to the residue that you have described heretofore in regard to the Poland property?

"A. That is right.

\* \* \* \* \* \* \*

"Q. Those were your own valuations, finally determined for the land to be taken and the damage to the residue of the property?

"A. Let me think that over for a moment. Obviously, five men cannot come up with or can hardly be expected on a controversial issue to come up with identical figures. It is only natural that there should be some variation in the opinion. In order to resolve that variation, we used this method of averaging and rounding them out.

"Had there been a very wide variation, or had any one of us felt that the average, which was the answer that we proposed to fill in these blanks as to the final answer—if there had been any wide variation between us, in that answer, or if we had felt that our own opinion was out of line with the average, I am sure that the matter would have been raised and we would have discussed the matter at even greater length, but there was not, and so we arrived at this composite figure which we all agree to. Does that make it clear?

\* \* \* \* \* \* \*

"Q. Did I understand you to say there was a binding agreement or understanding that you would bring in an award in these cases on an average of what each one of you found?

"A. Nothing so formal as that. It was suggested that we put, each put down our own figures, and average them up, and that would be the method of arriving at the final figure.

"Q. Do you consider these figures fair and impartial awards?

"A. Yes, I do.

"Q. Suppose, for instance that somebody had put down a figure of $100,000 in several of these awards. It would have brought them way up. Would you have agreed to that?

"A. No, I would not. I might point out that our findings were well within the range of the figures submitted by the various witnesses. It would be interesting, as a matter of fact, to see, if you average up the witnesses, what sort of answer you would have gotten. I do not know. We did not do that."

Quotient jury verdicts and quotient commission awards are con-

demned. The authorities are in accord that when a verdict or award is made by jurors or commissioners in pursuance of a previous agreement to accept the average amount of their several individual estimates as the measure of damages or as their award without the assent of their considered judgment to such final sum or award, then in such case the verdict or award is invalid.

"It is a rule of general application that quotient verdicts are illegal." *Kelly* v. *Rainelle Coal Co.*, 135 W. Va. 594, 602, 64 S. E. (2d) 606.

"A quotient award, like that of a quotient verdict, implies an agreement in advance among commissioners or jurors that each will put down the amount he thinks the award or verdict should be, the aggregate of such sums then divided by the number of commissioners or jurors, and the result reached shall be their award or verdict. 19 M. J., Verdict, § 8, page 491." *Virginia Electric and Power Co.* v. *Marks*, 195 Va. 468, 476, 78 S. E. (2d) 677, 53 Am. Jur., Trials, §§ 1030, 1031.

"In reaching an award it is unfortunately too often the practice for each commissioner to make his estimate, and the average of the figures so obtained is taken as the award. This method is objectionable even if each commissioner states his honest opinion, since the law contemplates that the award shall be the sum which is in the opinion of the majority of the board, after due deliberation, the just compensation to which the owner is entitled, and not a figure arbitrarily obtained, which is not the correct amount in the opinion of any one of the commissioners; and it is doubly objectionable if one of the commissioners makes his estimate larger or smaller than what he really considers the proper amount, so as to make the average approximate his real opinion. Nevertheless, an award that is made by this method will not be set aside unless it appears that there is a previous agreement by the commissioners to be bound by the result." 6 Nichols, *Eminent Domain* (3d ed., 1951), § 26.5312, p. 225.

Here the evidence discloses that the commissioners discussed the testimony of the witnesses for some time, and then the suggestion was made and agreed to that each commissioner put down what he thought should be allowed as compensation for the land taken, damages to the residue, and the total of these two items. Upon adding up the figures put down by the five commissioners and dividing the results by five, the sums so ascertained were to be

abided by as the compensation for land taken, damages to the residue and the total awards. It is true that Commissioner Brown says that these average sums, when ascertained, were "rounded out" by either adding or subtracting a few dollars "to make it come out more or less even numbers," but he says that the few dollars that were either added or subtracted to bring about "even numbers" were not material.

The impropriety lies in the agreement to abide the result. The fact that a few dollars were either added or subtracted from the awards to make even figures does not cure the vice inherent in the agreement to arrive at awards by this method.

"It appears from this affidavit that it was agreed by the jury that each juror should give the sum to which he thought the plaintiff below was entitled and that the sum of these amounts should be divided by the number of jurors; the quotient to be the amount of plaintiff's verdict. This was done. The amount so found was nearly $300, but for the purpose of making the amount an even sum it was increased to $300. This verdict cannot be sustained. (*Johnson* v. *Husband*, 22 Kan. 277; *Werner* v. *Edmiston*, 24 id. 147.) After the amount was found by marking, aggregating and dividing there was no reconsideration. The addition to that amount was not made after a further consideration and decision of the cause upon its merits, but was for the one purpose of making an even amount. * * *" *Ottawa* v. *Gilliland*, 63 Kan. 165, 166, 65 P. 252, 88 Am. St. Rep. 232. *Benjamin* v. *Helena Light & R. Co.*, 79 Mont. 144, 255 P. 20, 52 A. L. R. 33; and 52 A. L. R. 43.

The commissioner in definite language stated that upon suggestion it was agreed by all five that the procedure would be followed, which resulted in a quotient figure. After reciting what was agreed to, he said that the sums to be so arrived at "would be it." It is also certain that after the agreement was made, the adopted procedure was adhered to, for he stated that the final awards of $11,280 and $7,000 to the respective landowners were the results of this quotient process, give or take a few dollars to make round figures.

"Where jurors by a previous agreement bind themselves to accept the quotient as their verdict, any subsequent assent to this result, however solemnly given, is made under a moral constraint which justly vitiates the verdict." Thompson and Merriman, *Juries* (2d ed.) § 411, p. 511.

The testimony clearly shows that an agreement was made to

abide the quotients when ascertained and was in each instance accepted and returned as the final awards by adding or subtracting a few dollars to make round figures.

It can hardly be doubted that each commissioner's liberty of dissenting from the figures so ascertained was prevented or materially affected by the previous agreement that the sum so arrived at "would be it." Their assent to the quotient was at best given under the moral constraint of their previous agreement and thus it does not represent the free will and considered judgment of the commission.

Because of this vice in the awards, they should be vacated and the cause remanded for the appointment of another commission.

SMITH, J., dissenting.

The majority opinion correctly states the principles of law that control these two cases, but I cannot wholly agree with the conclusions there reached in applying those principles to the facts.

The commissioners are not bound by the opinion of experts or by the apparent weight of the evidence and may base their conclusions upon their view of the land, but as stated by the majority this rule "is not to be considered as turning commissioners loose to take arbitrary or capricious action and return awards not related to the value of the property. Their awards are to be measured by the evidence and if the evidence clearly shows them to be unreasonable they should be set aside."

The record shows, especially in the Latham case, that the report of the commissioners is unreasonable, arbitrary and capricious and the award grossly excessive.

The Poland and Latham tracts of land are in the same neighborhood, located on the boundary line of Loudoun and Prince William counties and along famous Bull Run. The commissioner who testified stated that he relied heavily on the aesthetic value of the land, and while he testified that he did not fix damages to the remainder solely on that basis, he admitted that emphasis was put on the aesthetic value. Should the commissioners have valued the land on a sentimental basis due to its proximity to historic Bull Run they would have been on more solid ground.

The commissioners were in clear and direct language instructed to fix the fair market value of the land taken based on the price the

land would bring when offered for sale by one who desires, but is not obligated, to sell, and is bought by one who is desirous, but is under no necessity, of buying it. This instruction left no room for fixing an award upon the aesthetic value of the property or upon a mere guess.

No witness as to the value of the Latham land was called by the owner. The only direct testimony as to its value and what the resulting damages would be was that introduced by the condemner which showed the maximum value of that land to be $200 per acre. In addition to such testimony the only other evidence that cast any light on the Latham land value was the evidence introduced in the Poland case which is valuable for purposes of comparison.

All of the evidence shows not only that the Poland land is the best in the neighborhood and more valuable than the Latham land, but that the right of way crosses four highly cultivated fields on the Poland farm. Nevertheless, the commissioners awarded $219.97 an acre for the Poland land taken and for the less valuable Latham land the award by the same commissioners was $299.57, or about $80 more per acre for the Latham land than that awarded for the more valuable Poland land. Both awards can not be correct and such unexplainable result gives some substance to the claim that these are quotient awards.

Counsel for Latham brought out on cross examination of C. H. James, a real estate broker, that a Mrs. Jenie Latham had at an unnamed date sold a valuable dairy farm in the neighborhood, which he described as containing approximately 400 acres for $70,000 or $175 per acre. Later, however, another witness called by the condemner said the tract contained 300 acres and was therefore worth $233 per acre. Regardless of whether the farm contained 300 or 400 acres, it was a valuable dairy farm containing valuable improvements, including a dwelling house in excellent condition. Although the Latham farm had no such improvements, only a small tenant house, the commissioners awarded about $66 per acre more for that land than the highest value placed on the dairy farm.

Commissioners in condemnation cases are vested with greater power than that possessed by juries. In the case of a view by a jury what they see is ordinarily for the purpose of explaining and clarifying the evidence adduced and not to supply evidence. *Noell v. Commonwealth*, 135 Va. 600, 115 S. E. 679, and cases there cited. However, when commissioners view land they have the

power to base their award on what they see rather than on the evidence which appears in the record. Therefore, when an award is not based upon evidence that is subject to cross examination and review, but on facts found as a result of the commissioners' view and known only to them, the award should be closely scrutinized by the courts.

Consequently, when the awards now before us are properly reviewed, the sum fixed in the Poland case for the land taken is supported by evidence and while the damages awarded in that case seem excessive, I cannot say that award is grossly excessive; however, the award in the Latham case is grossly excessive and should be rejected and the report recommitted. I would reverse in that case.

MILLER, J., joins in this dissent.